**ALABAMA AIRCRAFT INDUSTRIES, INC.-BIRMINGHAM, Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**The Boeing Company, Intervening Defendant.**

No. 08–470C.

United States Court of Federal Claims.

Filed Under Seal: Sept. 30, 2008.

Reissued: Oct. 7, 2008.

plies that extremely detailed drawings were not required in the initial proposal.

David R. Hazelton, Latham & Watkins LLP, Washington, D.C., for plaintiff. With him on the briefs were Roger S. Goldman, Kyle R. Jefcoat, Benjamin Wei, Andrew Stein, and Shiva Aminian, Latham & Watkins LLP, Washington D.C.

Douglas K. Mickle, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Gregory G. Katsas, Assistant Attorney General, Civil Division, Jeanne E. Davidson, Director, and Brian M. Simkin, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel were Major Christopher L. McMahon, Air

Force Legal Operations Agency, Arlington, Virginia and Kenneth C. Kitzmiller, Tinker Air Force Base Legal Office, Oklahoma City, Oklahoma.

Paul F. Khoury, Wiley Rein LLP, Washington, D.C., for intervening defendant. With him on the briefs were Rand L. Allen, Scott M. McCaleb, Kara M. Sacilotto, Nicole P. Wishart, and Heidi L. Bourgeois, Wiley Rein LLP, Washington, D.C.

## OPINION AND ORDER[1]

LETTOW, Judge.

Alabama Aircraft Industries, Inc.—Birmingham ("Alabama Aircraft")[2] filed suit in this court challenging the Department of the Air Force's ("Air Force") award of a contract to perform maintenance and install modifications on the Air Force's KC–135 Stratotanker fleet. The Air Force made the award to Boeing Aerospace Operations ("Boeing"). The projected total value of the contract is $1.2 billion. AR 6–78 (Proposal Analysis Report and Price Competition Memorandum).[3] Alabama Aircraft contests the award to Boeing on three principal bases: (1) that Boeing had organizational conflicts of interest which the Air Force failed to identify and mitigate; (2) that the Air Force erred in finding that Boeing's past performance of relevant contracts satisfied the standard of "satisfactory

confidence;" and (3) that the Air Force failed adequately to conduct a price-realism analysis of Boeing's proposal. This suit follows on the heels of two separate rounds of proceedings before the Government Accountability Office ("GAO"). The parties have submitted cross-motions for judgment on the administrative record in accordance with RCFC 52.1(b).

Also pending before the court are the motions of the United States and Boeing to dismiss Alabama Aircraft's protest for lack of standing. The motions are premised upon claims that Alabama Aircraft was not an "actual or prospective bidder" in this procurement and that it lacks sufficient financial resources to perform the KC–135 contract.

After expedited proceedings to clarify the administrative record, see Alabama Aircraft Indus.—Birmingham v. United States, 82 Fed.Cl. 757 (2008),[4] a hearing on the pending motions and an evidentiary hearing on jurisdictional issues were held on September 4 and 5, 2008. The competing motions accordingly are ready for disposition.

## FACTS[5]

### A. The Air Force's Solicitation

The instant protest arises from competing proposals to secure a contract to provide

---

1. Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(7) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information on or before October 6, 2008. The proposals were timely submitted, and a closed hearing was held on October 7, 2008. The resulting redactions are shown by brackets enclosing asterisks, as follows: "[* * *]."

2. Alabama Aircraft was formerly known as Pemco Aeroplex, Inc. ("Pemco Aeroplex"), and it submitted its bid in this case under its former name. See, e.g., Hr'g Tr. 29:4–15 (Sept. 4, 2008); Compl. ¶ 1.

3. "AR ——" refers to the administrative record filed with this court in accordance with RCFC 52.1(a). The administrative record is massive, amounting to approximately 46,000 pages, and has been subdivided into tabs. The first number in a citation to the administrative record refers to

a particular tab, and the number after the hyphen refers to a page within a tab, e.g., "AR 4–1."

The transcript of a hearing and evidentiary hearing held on September 4 and 5, 2008 is cited as "Hr'g Tr. ——." Alabama Aircraft's exhibits admitted into evidence at the evidentiary hearing are cited as "PX ——" and Boeing's exhibits are cited as "BX ——."

4. The prior decision granted motions for supplementation of the administrative record and discovery insofar as materials withheld by the government on grounds of attorney-client privilege and work-product protection were concerned, after tentatively finding a waiver of the privilege and protection. Alabama Aircraft, 82 Fed.Cl. at 771–72, 774.

5. The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement and evidentiary submissions related to the jurisdictional and equitable-relief issues. See Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed.Cir.2005) (bid

maintenance for KC–135 Stratotankers, consisting of Programmed Depot Maintenance ("PDM") and Unscheduled Depot Level Maintenance ("UDLM"), as well as the installation of modifications on the aircraft (collectively the "PDM Program"). The Oklahoma City Air Logistics Center at Tinker Air Force Base ("Tinker") is responsible for the KC–135 PDM program and the award of the present contract. *See* AR 4–1 (Solicitation–Request for Proposal (August 19, 2005)). PDM for the KC–135 has been provided by Air Force facilities at Tinker and by contractors operating their own facilities. Most recently, Boeing has served as the contractor for KC–135 PDM, operating at facilities located in San Antonio, Texas. As a subcontractor to Boeing, Alabama Aircraft has also provided PDM services at a facility located in Birmingham, Alabama.[6]

Under the terms of the initial Request for Proposals ("RFP") issued in 2005, the contract would have a base period of four years and one month, plus five option years. AR 2–1 (Contracting Officer's Statement of Facts (Oct. 19, 2007)). "The RFP was for the award of a Firm Fixed Price and Fixed Price Award Fee Indefinite Delivery Indefinite Quantity Contract." *Id.*

On May 20, 2005, the Air Force circulated a draft RFP, Compl. ¶ 19, and on August 19, 2005, the Air Force released the official version of the RFP. AR 4–1 (Solicitation–Request for Proposal). The RFP provided a Best Estimated Quantity ("BEQ") of one aircraft requiring contractor's PDM in the first year of the contract, eight in the second year, 24 in the third year, and 44 per year for the remainder of the contract. *See* AR 46.12–1581 (Request for Proposal, Amendment 4 (May 31, 2006)).

The RFP provided that the Air Force would select the winner of the procurement on the basis of which competitor "gives the Air Force the greatest confidence it will best meet our requirements affordably." AR 4–78 (Solicitation–Request for Proposal). To aid in evaluating the competing proposals, the Air Force established four categories of inquiry: mission capability, proposal risk, past performance,[7] and cost/price.[8] AR 4–79 (Solicitation–Request for Proposal). In assessing an offeror's mission capability, the Air Force listed five subfactors for consideration: depot maintenance, supply chain management, transition, program management, and small business. AR 4–79 (Solicitation–Request for Proposal).[9] Each of the mission

protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court"); *Santiago v. United States,* 75 Fed.Cl. 649, 653 (2007) ("In accord with RCFC 52.1, the court 'is required to make factual findings … from the [administrative] record as if it were conducting a trial on the record.' ") (quoting *Acevedo v. United States,* 216 Fed.Appx. 977, 979 (Fed.Cir.2007)).

Other findings of fact and mixed findings of fact and conclusions of law are stated in the analysis which follows.

6. Alabama Aircraft provided KC–135 PDM services as a prime contractor under a contract with the Air Force from 1994 through 2001. *See Alabama Aircraft,* 82 Fed.Cl. at 760. Alabama Aircraft has served as a subcontractor to Boeing on the KC–135 PDM program since the companies entered into a Memorandum of Agreement in 2000. *Id.* That Memorandum of Agreement was entered at the request of the Air Force after Boeing had been awarded the prime contract but had difficulties performing the work. *Id.* Boeing currently holds a bridge contract for the PDM work, effective October 1, 2005, and extending through September 30, 2008. *Id.* Alabama Aircraft continues to serve as a subcontractor to Boeing under that bridge contract. *Id.*

Further details about the extensive history of contracts under the PDM program are set out in

the court's prior opinion. *See* 82 Fed.Cl. at 760–761.

7. Under the RFP, the Air Force evaluated whether an offeror could successfully perform under the terms of its offer, given its prior and present performance on government contracts, and in that regard assigned the offeror a performance-confidence assessment. AR 4–83 (Solicitation–Request for Proposal). The RFP provided that an offeror could receive a performance-confidence assessment of "high confidence," "significant confidence," "satisfactory confidence," "unknown confidence," "little confidence," or "no confidence." AR 4–84 (Solicitation–Request for Proposal).

8. Under the terms of the RFP, "the evaluation factors other than price, when combined, are significantly more important than price; however, price will contribute substantially to the selection decision." AR 4–79 (Solicitation–Request for Proposal).

9. Under the RFP, "subfactors 1, 2, and 3 are of equal importance and individually are of more importance than subfactor[s] 4 or 5, with subfactor 5 being the least important subfactor." AR 4–79 (Solicitation–Request for Proposal).

capability subfactors was to be assigned a color rating and a proposal risk rating. AR 4–79 (Solicitation–Request for Proposal).[10] Although the KC–135 PDM contract was to be a fixed-price contract, the RFP explicitly required the Air Force to evaluate the "reasonableness and realism of the prices and labor rates proposed" by the offerors. AR 4–86 (Solicitation–Request for Proposal). In determining which offeror should receive the award under the RFP, the Source Selection Authority ("SSA") was to make a decision based on "an integrated assessment of the source selection team's evaluations of the evaluation factors and subfactors." AR 4–78 (Solicitation–Request for Proposal).

The Air Force purchased 732 KC–135 Stratotankers between 1954 and 1965. AR 3–59 (Department of Defense Inspector General Report ("DODIG Report")). As the KC–135 model aged, the Air Force found it necessary to implement a maintenance program for the aircraft. AR 3–59 (DODIG Report). Because the KC–135 fleet continues to age, the Air Force expects the KC–135 PDM program to become increasingly more complex and to require an increase in the labor hours necessary to perform PDM. *See* AR 65–2 (Talking Paper on C/KC 135 PDM Recompetition Source Selection (Jun. 9, 2006) ("Air Force Talking Paper")); *see also* Compl., Ex. 20 (C/KC–135 Depot Maintenance Hours Per Aircraft). Specifically, the maintenance history of the KC–135 has confirmed that the "growth in corrosion related work" attributable to the aging of the KC–135 fleet constitutes a significant challenge. AR 65–2 (Air Force Talking Paper).

On October 31, 2005, Boeing, with Pemco Aeroplex (as Alabama Aircraft was previously named) serving as its subcontractor, submitted a proposal under the terms of the

RFP. AR 50 (Boeing and Pemco's Joint Proposal (Oct. 31, 2005)). On May 31, 2006, the Air Force filed an amendment to the RFP providing for a BEQ of six aircraft in the first year of the contract and a BEQ of 24 in the remaining years of the contract. *See* AR 46.12–1581 (Request for Proposal, Amendment 4 (May 31, 2006)).[11] In June 2006, the Air Force reduced the maximum number of KC–135s that would potentially need to receive PDM from the offerors from 60 to 48. AR 2–1 (Contracting Officer's Statement of Facts). In response to these reductions in workload, Boeing terminated its partnership with Pemco Aeroplex. *See Pemco Aeroplex, Inc.,* B–310372, 2007 WL 4707636, at *2 (G.A.O. Dec. 27, 2007) (*"Pemco Aeroplex I"*).[12]

To guarantee its ability to bid for the contract, Pemco Aeroplex filed a protest with the Air Force. *See* AR 2–3 (Contracting Officer's Statement of Facts). In response to Pemco Aeroplex's protest, the Air Force amended the RFP to allow for the submission of new offers. *See Pemco Aeroplex I,* AR 64–6. In September 2006, Pemco Aeroplex, Boeing, and Lockheed Martin each submitted proposals to the Air Force. *See* AR 2–3 (Contracting Officer's Statement of Facts). The Air Force required the three offerors to submit their final proposals by June 22, 2007. *See* AR 2–2 (Contracting Officer's Statement of Facts).

Boeing planned to rely upon L–3 Communications Integrated Systems ("L–3") as one of its subcontractors if it were to be awarded the procurement. AR 22–4 (Boeing Proposal (Sept. 8, 2006)).[13] Both Boeing and L–3 have additional contracts with the Air Force that relate to the KC–135 fleet. Def.'s Counterstatement of Facts ("Def.'s Facts") at 7. L–3 is serving as a subcontractor in implementing

---

**10.** The RFP provided for ratings of "Blue/Exceptional," "Green/Acceptable," "Yellow/Marginal," and "Red/Unacceptable." AR 4–80 (Solicitation–Request for Proposal).

**11.** The Air Force later modified the BEQ for the KC–135 PDM to two aircraft for the first year of the contract and 24 for every year thereafter. AR 46.12–1605 (Request for Proposal, Amendment 11 (May 11, 2007)).

The eleventh amendment to the RFP was the final one. *See* AR 2–3 (Contracting Officer's Statement of Facts).

**12.** This decision by GAO has been made part of the administrative record as Tab 64, and accordingly it will be subsequently cited by reference to that Tab.

**13.** L–3 had been included in Boeing and Pemco Aeroplex's joint proposal as a subcontractor. *See* AR 50–52 (Boeing and Pemco's Joint Proposal).

a "Lean" transformation program at Tinker, and in that capacity it has been involved in initiating the "transformation of the organic KC–135 PDM line." AR 93.1–1658 (Contracting Officer's Statement of Facts (Oct. 18, 2007)).[14] Boeing has an engineering services contract with the Air Force to provide "day to day maintenance of the KC–135 weapon system platform and to develop modifications to the KC–135 to ensure the continued service life of the KC–135." Def.'s Facts at 9; *see also* AR 74–50 (Alabama Aircraft's Supplemental Protest to GAO, B–310372.4 (Mar. 21, 2008)). Additionally, the Air Force selected Boeing to serve as a technical consultant on this procurement. AR 4–51 (Solicitation–Request for Proposal). In that regard, the RFP stated that "Boeing will only be used for technical questions which the Source Selection Team may not be able to answer and those individuals at Boeing who are responsible for answering the questions will sign Non–Disclosure Agreements." AR 4–52 (Solicitation–Request for Proposal).

*B. The Offerors' Proposals, the Air Force's Inquiries, Final Proposals, and the Initial Award*

Addendum 1 to the RFP divided the work under the contract into 3 categories: PDM,[15] Firm Fixed Price Intermittent Tasks,[16] and Over and Above ("O & A") work.[17] *See* AR 46.12–365 (RFP–Addendum 1 Work Requirements and Procedures (Aug. 12, 2005)) ("RFP–Addendum 1"). Addendum 1 informed potential offerors that prior to undertaking any O & A work the contractor must seek the government's approval. AR 46.12–366 (RFP–Addendum 1). If the Air Force determines that the proposed work is necessary and not encompassed by other provisions of the contract, "[t]he Government and the Contractor will then negotiate a settlement for the O & A." AR 46.12–366 (RFP–Addendum 1). The price the government would pay for the O & A work would reflect the required labor hours established through negotiations between the contractor and the administrative contracting officer, "multiplied by the contract hourly rate." AR 46.12–366 (RFP–Addendum 1). Addendum 1 informed potential offerors that the work requirements shown in Attachment F of the contract may be varied from year to year. AR 46.12–367 (RFP–Addendum 1). However, Addendum 1 does not explicitly address the problems of performing maintenance on an aging KC–135 fleet. AR 46.12–367 (RFP–Addendum 1).[18]

A key component of Boeing and Pemco's proposals was the manner in which they conceived to implement the so-called "Lean" program given their abilities and limitations. *See* AR 6–25, 35 (Proposal Analysis Report and Price Competition Memorandum); Hr'g Tr. 137:5–9. The Lean program aims to streamline the KC–135 PDM process and to eliminate wasteful and unnecessary steps, thus increasing the program's efficiencies. Hr'g Tr. 134:16–24, 202:2–5. It seeks to achieve these results both in the actual maintenance work on the aircraft and the resources used to manage the maintenance program. Hr'g Tr. 135:21–22, 202:2–5.

Boeing's version of the Lean program applied "lean principles in cells or specific aircraft positions." Hr'g Tr. 202:17–19 (referring to the "Lean Cellular Maintenance System"). In implementing its Lean Cellular Maintenance System, Boeing focused on the proportion of time its employees actually spent working on the KC–135s. *See* Hr'g Tr. 203:2–4. To increase that "touch" time, and thus efficiency, Boeing sought to

---

14. "Organic PDM" is PDM that is performed by the Air Force at Tinker.

15. The requirements for Programmed Depot Maintenance were set forth in attachments to the RFP. *See* AR 46.12–509 (RFP–Addendum 1).

16. Addendum 1 explains that Firm Fixed Price Intermittent Tasks constitute maintenance work that "is discretely defined, pre-priced and performed at the election of the Government." AR 46.12–365 (RFP–Addendum 1).

17. Addendum 1 defines O & A work as unexpected repairs which "require more than 200 hours to complete or exceed[] $20,000 in material cost." AR 46.12–365 (RFP–Addendum 1).

18. Addendum 1 does provide that "[i]f at any time during contract performance, sufficient data becomes available on a repetitive task being performed in the O & A category, either the Contractor, the PCO, or the ACO may request a negotiation to establish a firm-fixed price for the item for incorporation into the basic PDM price." AR 46.12–367 (RFP–Addendum 1).

deliver [* * *] to the mechanics as they worked on the plane. Hr'g Tr. 202:20–23. Parts projected to be needed [* * *]. *See* AR 22–268 (Boeing Initial Proposal (Sept. 8, 2006)). To implement processes associated with its Lean Cellular Maintenance System, Boeing devised an [* * *] approach to service 24 KC–135 aircraft yearly. *See, e.g.,* AR 30–2264 (Boeing Second Final Proposal Revision (June 18, 2007)) ("Boeing's Second Revision"); Hr'g Tr. 205:14–25. However, depending on the number of KC–135s that the Air Force would send for maintenance on a yearly basis, Boeing proposed to [* * *] at its maintenance facility. AR 30–2264 (Boeing's Second Revision); Hr'g Tr. 215:17 to 216:14. Boeing's [* * *] was designed to [* * *] and allow the mechanics to have efficient access to the aircraft to meet the contract's timely delivery requirements. Hr'g Tr. 215:6 to 216:14.

Pemco's conception of the Lean program was structured around a[* * *] approach. AR 16–19 (Pemco Second Final Proposal Revision (June 18, 2007)) ("Pemco's Second Proposal"). As with Boeing, Pemco's approach was governed in part by the physical characteristics of its facilities, namely the shape and size of its maintenance hangars. Hr'g Tr. 141:18 to 142:15. Pemco's [* * *] approach limits the number of times the aircraft has to be moved in the PDM process. Hr'g Tr. 142:7–15. To meet the Air Force's BEQ of 24 KC–135s per year, Pemco planned to use a[* * *] approach to performing PDM, relying on different hangars for the [* * *]. AR 16–116 (Pemco's Second Proposal). Pemco's approach effectively adds more [* * *] by adding a further lines to accommodate an increase in aircraft requiring contractor PDM. *See* AR 6–35 (Proposal Analysis Report and Price Competition Memorandum).[19] Pemco also proposed to employ [* * *].

Essential to the ultimate decision of the Air Force to award the contract to Boeing was the manner in which the competitors constructed and used their "learning curves."

*See, e.g.,* AR 2–19 (Contracting Officer's Statement of Facts); AR 54–5 to 54–8 (Contracting Officer's Statement of Facts (Apr. 18, 2008)). A learning curve is a mathematical representation of performance and efficiency gains realized on related contracts or similar work. Hr'g Tr. 218:17–21; *see also* Compl., Ex. 21 (Louis E. Yelle, *The Learning Curve: Historical Review and Comprehensive Survey* (1979) ("Yelle, *The Learning Curve*"))at 309. Two areas important for generating improvements in a firm's learning curve for a given type of work are gains in the skills of the employees and the elimination or reduction of unproductive activity, *e.g.,* leaving a worksite for the purpose of gathering or retrieving tools or necessary materials. Yelle, *The Learning Curve* at 306. The greatest gains in efficiency occur "early in the process" and improvements become harder to achieve over time as the more easily achieved improvements have been realized. Hr'g Tr. 220:1–6.

Boeing's initial proposal, with Pemco Aeroplex serving as a subcontractor, proposed a[* * *] learning curve. AR 50–57 (Boeing's and Pemco's Joint Proposal). All of Boeing's subsequent proposals contained a[* * *] learning curve for [* * *] periods, gradually leveling off over later periods in an asymptotic function. *See, e.g.,* AR 60–15 (Proposal Analysis Report and Price Competition Memorandum (Feb. 27, 2008)); *see also* AR 60–11 (graphical representation, showing "Boeing's learning curve go[ing] flat in the [* * *] year of contract performance").[20] In Boeing's initial proposal, it projected that during the first [* * *] years of the contract, the labor hours necessary to complete PDM on a KC–135 would decrease and then would stabilize at that rate for the remainder of the contract. AR 50–58 (Boeing's and Pemco's Joint Proposal). After severing its relationship with Pemco, Boeing's initial solo proposal [* * *] projected a decrease in labor hours for the first [* * *] years of the contract and then showed a constant work rate for the

---

**19.** To accommodate a higher number of aircraft, Pemco would use up to [* * *], each using its [* * *]. *See, e.g.,* AR 6–35 (Proposal Analysis Report and Price Competition Memorandum); Hr'g Tr. 146:25 to 147:10.

**20.** In its second final proposal revision, Boeing states that the data it analyzed to construct its learning curve actually supported a[* * *] learning curve. AR 30–1539 (Boeing's Second Revision).

remainder of the contract. AR 22–899 (Boeing's Initial Proposal). In a first set of evaluation notices sent to Boeing, the government inquired as to why Boeing had not projected continuous improvement in its performance after the [* * *] year of the contract. AR 23–4 (Boeing Initial Evaluation Notices (Oct. 26, 2006)). In its response to the Air Force's inquiry, Boeing replied:

> Theoretically, Boeing agrees with the government. However, learning curve improvements are predicated on a stable work package and predictable quantity throughput. Boeing has chosen to recognize learning improvement through the PDM work statements provided [* * *]. Based upon the recent volatility in the PDM throughput and the unknowns associated with the work package in [* * *] through [* * *], Boeing has chosen not to reflect the savings beyond the last aircraft in [* * *].

AR 24–6 (Boeing Initial Offeror Response Summary (Nov. 10, 2006)).

When Boeing submitted its final revised proposal ("Final Revision") it incorporated a[* * *] learning improvement over [* * *] relevant years. AR 27–876 (Boeing's Final Revision (Feb. 23, 2007)).[21] The incorporation of a[* * *] learning improvement resulted in a reduction of labor hours necessary to perform PDM during the [* * *] to [* * *] portion of the contract. *Compare* AR 27–877 (Boeing's Final Revision), *with* AR 22–899 (Boeing's Initial Proposal).[22] In its Final Revision, Boeing did not provide an explanation as to why it had changed to a[* * *] learning improvement, except that it advised that "[t]he final change related to the touch labor is that we have priced [* * *] improvement beyond [* * *] along the defined curves. [The][p]rior submittal did not assume improvement beyond the last aircraft in [* * *]." AR 27–876 (Boeing's Final Revision). In actuality, the projected improvement in Boeing's Final Revision exceeded the learning curve in the [* * *] years; the

[* * *] function of [* * *] improvement [* * *] exceeded the improvement that was indicated by the asymptotic learning curve.

Pemco Aeroplex's proposals included a[* * *] learning curve for the [* * *] year of the contract. AR 8–975 to 8–976 (Pemco's Initial Proposal (Sept. 14, 2006)). Pemco projected that after the [* * *] year of the contract it would not realize a reduction in the hours required to perform PDM. AR 8–977 (Pemco Initial Proposal). As with Boeing, the Air Force in its initial evaluation notices inquired into Pemco Aeroplex's failure to incorporate a continuous learning curve into its offer. AR 9–5 to 9–6 (Pemco Initial Evaluation Notices (Oct. 26, 2006)). In response to the Air Force's question, Pemco stated:

> The learning curve projections are consistent with a[* * *] mid point aircraft in FY [* * *] and FY [* * *] aircraft at [* * *] hours. The learning curve will have matured by the completion of the [* * *] providing a stable projection of [* * *] hours for the BEQ of 24 for years FY [* * *] and subsequent years.

AR 10–9 (Pemco's Initial Offeror Response Summary (Nov. 10, 2006)). In its final response, unlike Boeing, Pemco did not alter its learning-curve projection. *See* AR 13–805 to 13–806 (Pemco's Final Proposal Revision (Feb. 23, 2007)). Pemco's refusal to convert its learning-curve into a[* * *] function was premised in part upon the fact that the greatest learning gains are realized early in the process and in part upon the belief that the aging of KC–135 fleet would prevent it from realizing efficiencies in the later years of the contract. *See* AR 93.1–1653 (Contracting Officer's Statement of Facts). Pemco's failure to extend its learning-based reductions in labor hours was the leading factor contributing to Boeing's having lower labor hours and a lower total evaluated price. *See, e.g.*, AR 75–339 (Test. of Nancy Filippo, PKC

---

**21.** Boeing thus put forward what amounted to a[* * *] learning function over the period covered by the [* * *], rather than an asymptotic function that gradually tended toward a given level of efficient performance as the learning process matured.

**22.** Due to the extension of the learning improvements, Boeing would experience a savings in performing basic touch PDM labor of [* * *] hours per plane in [* * *]. *Compare* AR 27–877 (Boeing's Final Revision), *with* AR 22–899 (Boeing's Initial Proposal).

Price/Cost Analyst, GAO Hearing Transcript, B–310372 (Nov. 8–9, 2007)).

As the Air Force was nearing a decision on the procurement, Pemco Aeroplex's parent decided to undertake a corporate restructuring program. The restructuring involved a sister subsidiary of Pemco Aviation Group, Inc. ("Pemco Aviation"). Hr'g Tr. 29:4–8. In addition to Pemco Aeroplex, Pemco Aviation was the parent of Pemco World Air Services ("Pemco World Air") [23] and Space Vector Corporation.[24] Hr'g Tr. 29:4–8. To improve its financial posture, Pemco Aviation decided to sell Pemco World Air. Hr'g Tr. 78:1 to 79:6. During the latter half of 2006, representatives of Pemco Aeroplex and Pemco Aviation began to have discussions with government officials about the proposed sale of Pemco World Air, and the frequency of those discussions increased as the possibility of a sale became more likely. Hr'g Tr. 75:14 to 76:3. In July 2007, Pemco Aviation announced the sale of Pemco World Air to an affiliate of Sun Capital Partners, Inc. PX 4 (E-mail from Randy Shealy to Jean Carter and Lt. Col. Bernard Badami (July 11, 2007)).[25] On the date the sale was announced, Pemco Aviation's Chief Financial Officer sent an e-mail to the Administrative Contracting Officer for the KC–135 contract and to the head of the local Defense Contract Management Agency, alerting them of the change. Hr'g Tr. 76:19–25; PX 4. On September 19, the sale of Pemco World Air was completed and the purchaser acquired the exclusive right to the Pemco name. Hr'g Tr. 32:11 to 33:3, 33:8 to 33:13. The names of

Pemco Aircraft and Pemco Aeroplex consequently were changed to Alabama Aircraft and to Alabama Aircraft Industries, Inc.-Birmingham, respectively. Hr'g Tr. 33:14–25. At that point, Alabama Aircraft became a small business, *i.e.*, one with less than 1,000 employees. Hr'g Tr. 36:17–22.[26] It did not, however, seek to amend its proposal to provide that information to the Air Force, in part because the Air Force had just completed its analysis of the proposals and had announced that Boeing was the awardee.

In its analysis of the competing offers, the Air Force awarded Boeing and Alabama Aircraft the same ratings for depot maintenance, transition, program management, and small business. AR 5–22 (Source Selection Decision Document (Sept. 7, 2007)) ("Decision Document"). The Air Force concluded that Boeing's proposal offered the lowest total evaluated price and superior supply chain management, while Alabama Aircraft's proposal had a better past performance record. AR 5–22 (Decision Document).[27] The Source Selection Authority awarded the contract to Boeing because "Pemco's better record of past performance [wa]s not sufficient to outweigh the benefits of Boeing's superior Mission Capability proposal and $15,048,062 lower TEP [total evaluated price]." AR 5–22 (Decision Document). On September 10, 2007, the Air Force informed Alabama Aircraft that Boeing would be awarded the contract. Compl. ¶ 36.

*C. The First GAO Protest*

On September 11, 2007, Alabama Aircraft requested a debriefing, which occurred on

**23.** Pemco World Air provided "commercial aircraft maintenance and modification services on a contract basis to the owners and operators of large commercial aircraft." Pl's Opp'n to Mot. to Dismiss, Ex. G (Pemco Aviation Annual Report Form 10–K) (Apr. 16, 2007) at 1.

**24.** Space Vector Corporation "designs and manufactures a wide array of proprietary aerospace products including various space systems, such as guidance control systems and launch vehicles." Pl.'s Opp'n to Mot. to Dismiss, Ex. F (Pemco Aviation Quarterly Report Form 10–Q (August 14, 2007)) at 7.

**25.** Pemco Aviation announced the sale of its subsidiary by filing an 8–K with Securities and Exchange Commission ("SEC") and disseminating a press release. Hr'g Tr. 32:14–15. Subsequent-

ly, it filed both preliminary and final proxies with the SEC. Hr'g Tr. 32:21–24.

**26.** At the evidentiary hearing on jurisdictional issues, testimony was received that Alabama Aircraft has approximately 550 employees. Hr'g Tr. 36:20–22.

**27.** Although Boeing and Alabama Aircraft both received a rating of satisfactory confidence for past performance, AR 5–22 (Decision Document), the Air Force considered Alabama Aircraft's past performance to occupy "the high end of satisfactory" whereas Boeing's past performance was considered to be notably poorer. AR 6–164 (Proposal Analysis Report and Price Competition Memorandum); AR 5–22 (Decision Document).

September 14, 2007. AR 21 (Pemco Debriefing (Sept. 14, 2007)); Compl. ¶ 36. Following the debriefing, on September 19, 2007, Alabama Aircraft filed a protest at GAO, Compl. ¶ 38, challenging the award to Boeing on several grounds including the failure of the Air Force to identify and mitigate potential organizational conflicts of interest; inappropriate evaluations of the past performance, mission capability, and price factors; and "an alleged violation of the procurement integrity provisions of the Office of Federal Procurement Policy Act, 41 U.S.C. § 423." *Pemco Aeroplex I*, AR 64–5. On December 27, 2007, GAO issued a decision sustaining Alabama Aircraft's protest on the ground that the Air Force's price evaluation was flawed; GAO rejected Alabama Aircraft's other challenges to the award. *Id.*, AR 64–5, 64–22.

GAO considered that the Air Force's price evaluation was flawed because of the lack of documentation "regarding any agency consideration of the basis for Boeing's changed assumptions, how Boeing's revised assumptions correspond to the reality of the aging KC–135 fleet discussed by the agency, [or] how the revised assumptions correspond to the agency's own labor hour projections." *Pemco Aeroplex I*, AR 64–17. Absent documentation, GAO was "unable to determine whether the agency reasonably concluded that Boeing's proposed price is realistic, or whether the agency's assessment of 'low risk' for Boeing's proposal, under each of the mission capability subfactors, is reasonable in light of Boeing's revised labor hour assumptions." *Id.* To address the shortcomings identified by its decision, GAO recommended that the Air Force "perform and document a realism assessment regarding Boeing's assumption of [* * *] decreasing labor hour requirements in the context of an aging KC–135 aircraft fleet, along with a risk assessment regarding … Boeing's labor hour reductions." *Id.*, AR 64–22.

In response to GAO's decision, the Air Force filed a request for reconsideration. *See Pemco Aeroplex, Inc.-Reconsideration,* B–310372.2, 2008 WL 360927, at *1 (G.A.O.

Feb. 1, 2008) *("Pemco Aeroplex II").*[28] The Air Force's motion was premised on the grounds that the GAO decision ignored evidence that the Air Force had properly analyzed and documented Boeing's reduction in labor hours and price in its final proposal. *Id.*, AR 63–4. The Air Force contended that an evaluation notice sent to Boeing in October 2006 had requested an explanation of its failure to extend its learning curve [* * *], and the response showed a detailed analysis of the labor hours. *Id.*, AR 63–6. On February 1, 2008, GAO rejected the Air Force's request for reconsideration, adhering to its determination that the record lacked a "contemporaneous evaluation of the effect of Boeing's reducing its proposed number of labor hours on proposal risk or price realism." *Id.*, AR 63–5. The Air Force had also argued that the RFP and Addendum 1 addressed the question of aging aircraft, "assert[ing] that the RFP actually assumes a non-aging fleet." *Id.*, AR 63–5 to 63–6. GAO refused to consider that contention by the Air Force, concluding that it was not properly before it. *Id.* GAO noted that "Pemco twice raised (and the [Air Force] explicitly acknowledged) the aging aircraft issue," but the Air Force had not previously raised in its defense the claim that the RFP had assumed a non-aging fleet. *Id.* GAO nonetheless commented that it had reviewed the documents cited by the Air Force and found "unpersuasive the agency's claim that any portion of the cited documents put offerors on notice that they should assume an aircraft fleet that does not continue to age." *Id.*, AR 63–6 n. 4.

### D. The Air Force's Corrective Action

In response to GAO's decision sustaining Alabama Aircraft's protest on grounds of a flawed price analysis and the failure to consider the risk created by Boeing's reduction in projected labor hours, the Air Force took a limited corrective action. *See* AR 54–1 (Contracting Officer's Statement of Facts). The Air Force did not seek new information from any of the offerors. *See, e.g.,* AR 56–7 to 56–10 (Pemco Debriefing (Mar. 7, 2008)); AR 55–70 to 55–85 (Pemco Protest

---

**28.** GAO's decision on reconsideration is present in the administrative record at Tab 63 and will be cited to that Tab.

B.310372.3, Attach. 3 (Mar. 7, 2008)). Instead, the Air Force undertook an analysis with the information that it had in hand. AR 59–1, 59–9 to 59–10, 59–23 to 59–24 (Source Selection Decision Document (Feb. 29, 2008)). In performing the price analysis, as required by the RFP,[29] the Air Force concluded that:

Boeing's proposal supports their labor approach with historical information and a proposed improvement curve that is more conservative than their historical actuals. While a[* * *] learning curve increases Boeing's risk when compared to their IEB [Initial Evaluation Briefing] proposal, it is acceptable and achievable in light of the information submitted with the cost volume. Upon reconsideration, the evaluation team considers Boeing's proposed approach, including reduced flow days and labor hours[,] is achievable and realistic.

AR 60–16 (Proposal Analysis Report and Price Competition Memorandum (Feb. 27, 2008)).

Under the terms of the RFP, the contract was a fixed-price contract. AR 4–3 to 4–28 (Solicitation–Request for Proposal). In a fixed price contract, the risk of loss is borne by the contractor. In conducting the price-realism analysis, the Air Force examined the number of days Boeing proposed it needed to complete each step of its PDM program; the historical efficiency gains recognized by Boeing on other related contracts; the competitors' total average cost per aircraft; the average material cost per aircraft; and the average labor cost per aircraft. AR 60–69 (Proposal Analysis Report and Price Competition Memorandum); AR 61–36, 61–37, 61–90 (Final Decision Briefing (Feb. 27, 2008)). The Air Force concluded that Boeing's [* * *] learning curve and reduction in labor hours was not "unreasonable in light of past learning shown by Boeing on this and other programs and based on the specific requirements of a set work package [in accordance with] the RFP." AR 61–37 (Final Decision Briefing). In the Air Force's view, Boeing's decision to make its [* * *] showed a willingness to assume increased risk of loss on the contract and pass on savings attributable to gains in efficiency to the Air Force. AR 60–18, 60–20 (Proposal Analysis Report and Price Competition Memorandum).

Portions of the administrative record contradict the conclusion that Boeing increased its risk in this multi-year fixed-price contract by extending its learning curve. *See, e.g.,* 60–5 (Proposal Analysis Report and Price Competition Memorandum); 54–9 (Contracting Officer's Statement of Facts). The Air Force, in its Proposal Analysis Report and Price Competition Memorandum, stated: "Addendum I also clarified that the Air Force intends that negotiated adjustments to the proposed Firm Fixed Price (FFP) associated with this effort would be made during performance of the resulting to contract to accommodate T.O. [Technical Order] changes, chronic aging aircraft issues, modifications and work package changes." AR 60–5 (Proposal Analysis Report and Price Competition Memorandum). Moreover, the contracting officer, in response to Alabama Aircraft's second protest at GAO, stated that:

[a] review of Sections L & M of the RFP reveals that there is no requirement for the SSET [Source Selection Evaluation Team] to try and account for uncertainties of an 'aging KC–135 fleet.' ... It was fully understood by the incumbent Offerors that *out year work package changes would be negotiated* since this has been the common practice for years on the prior PDM contracts. Any new Offeror should have understood this concept as well, due to the fact that *RFP Addendum I stated that we would negotiate out year work package changes.*

AR 54–9 (Contracting Officer's Statement of Facts) (emphasis added).

### E. The Second GAO Protest

On March 3, 2008, the Air Force informed Alabama Aircraft that it had affirmed the award of the KC–135 PDM contract to Boeing. AR 55–39 (Protest B–310372.3 Attach.

---

**29.** The Federal Acquisition Regulations ("FAR"), by their own terms, do not require an agency to conduct a price-realism analysis in awarding a fixed price contract. *See* 48 C.F.R. § 15.305(a)(1), but in this case the RFP required the Air Force to perform a price-realism analysis. *See* AR 4–86 to 4–87 (Solicitation–Request for Proposal).

1 (Mar. 3, 2008)). On March 7, the Air Force debriefed Alabama Aircraft and Boeing. AR 56–1 (Pemco Debriefing (Mar. 7, 2008)); AR 57–1 (Boeing Debriefing (Mar. 7, 2008)). Subsequently, on March 11, Alabama Aircraft filed a protest with GAO. AR 55–1 (Protest B–310372.3). Alabama Aircraft's protest was based on its contention that the Air Force had failed to obtain and analyze necessary information from Boeing regarding its decision to implement a[* * *], especially given the realities of an aging KC–135 fleet. AR 55–7 to 55–12 (Protest B–310372.3).[30] In addition to its prior objections, Alabama Aircraft raised the alleged failure of the Air Force to inform it of potential changes to the PDM program cycle and the number of aircraft needing PDM, to consider the [* * *] of Boeing, to consider Alabama Aircraft's new small-business status a relevant factor, and to account for the alleged bias of a former Source Selection Authority. AR 55–25, 55–28, 55–32, 55–33 (Protest B–310372.3).

On March 21, 2008, Alabama Aircraft filed a supplement to its bid protest concerning the alleged failure of the Air Force to disclose proposed changes to the PDM cycle and an increase in the number of aircraft which an offeror would be required to service. AR 74–1 (Pemco Supplemental Bid Protest B–310372.4 (Mar. 21, 2008)).[31] Alabama Aircraft claimed that the Air Force was considering replacement of the current five-year cycle for PDM with a regimen of "light" PDM every four years and "heavy" PDM every eight years. AR 74–5 to 74–6 (Protest, B–310372.4). On May 2, 2008, GAO dismissed Alabama Aircraft's supplement. *Pemco Aeroplex Inc.,* No. B–310372.4, 2008 WL 1930918 (G.A.O. May 2, 2008) (*"Pemco Aeroplex III"*).[32] In reaching its decision to

dismiss Alabama Aircraft's supplemental protest, GAO relied upon a declaration supplied by Colonel James Nally, the officer responsible for both contractor and organic PDM maintenance. AR 84–7 (Agency Request for Summary Dismissal B–310372.4, Ex. 1 (Decl. of Colonel James J. Nally (Apr. 4, 2008) ("Nally Decl."))). Colonel Nally's declaration rebutted Alabama Aircraft's allegation that there had been a change in the BEQ and explained that the potential change in the PDM cycle "is an on-going study . . . to determine if the model is feasible. . . . All the data necessary to make this decision [to alter the current PDM cycle] will not be available until FY[20] 14. Until the study and prototyping is complete and the data fully evaluated, the requirement for contract PDM to support a five year cycle will not change." AR 84–7 to 84–8 (Nally Decl.).

On June 13, 2008, GAO denied Alabama Aircraft's protest of the Air Force's decision confirming the award of a contract to Boeing. *Pemco Aeroplex, Inc.,* B–310372.3, 2008 WL 2684841 (G.A.O. June 13, 2008) (*"Pemco Aeroplex IV"*).[33] GAO dismissed the portion of Alabama Aircraft's claim that the Air Force had erred by failing to solicit and acquire new information from the offerors. *Id.,* AR 91–7. GAO noted that the flaw identified in its prior decision was the lack of "documentation regarding a price realism analysis that considered the effect of the labor hour reductions incorporated into Boeing's final proposal revisions," along with a shortage of evidence suggesting the Air Force had analyzed the potential risk stemming from Boeing's reduction in labor hours. *Id.,* AR 91–5. To remedy this deficiency, GAO opined that the Air Force was not required to reopen discussions, but rather could reasonably have opted

---

**30.** Alabama Aircraft asserted as it had in its prior protest that the Air Force's normalization and risk analyses were flawed and therefore the award to Boeing should be set aside. AR 55–15, 55–20 (Protest B–310372.3). Alabama Aircraft contends that the Air Force was unable to perform "an 'apples to apples' comparison of the proposed labor hours of both Boeing and Pemco," and that the Air Force failed to take proper account of Boeing's "schedule and performance risks." *Id.*

**31.** After the award of the contract to Boeing, Pemco asserted that in a program management

review meeting, the Air Force had "announced . . . an increase in the expected number of aircraft undergoing contractor PDM each year from 24 to 36." AR 74–4 (Pemco Supplemental Bid Protest B–310372.3).

**32.** GAO's decision dismissing Pemco Aeroplex's supplement is present in the administrative record as Tab 90.

**33.** GAO's final decision is present in the administrative record as Tab 91.

to provide the documentation and evaluation that was missing from its original decision awarding the contract to Boeing. *Id.,* AR 91–7.

Then, on the merits, GAO dismissed Alabama Aircraft's claim that the Air Force's price-realism analysis was flawed. *Pemco Aeroplex IV,* AR 91–7 to 91–9. As part of its corrective action, the Air Force had evaluated both Boeing's price realism and the proposal risk given the extension of the learning function. *Id.,* AR 91–8. GAO addressed the aging-aircraft issue in light of the Air Force's representation that the RFP and Addendum 1 had negated or mitigated the issue, accepting that "the solicitation contemplates periodic renegotiation of the required PDM work packages, along with negotiated adjustments to the contractor's compensation." *Id.,* AR 91–6 n. 10. GAO alternatively concluded that even if the RFP and Addendum 1 did not remove the issue of providing PDM for an aging fleet of KC–135s, the Air Force had indicated that any increases in maintenance due to the natural aging of the aircraft "would not be significant enough to offset Boeing's projected efficiencies." *Id.,* AR 91–6.

### F. Procedural History in this Court

Promptly after GAO denied Alabama Aircraft's protest, Alabama Aircraft filed a complaint in this court on June 27, 2008. After Alabama Aircraft's complaint was filed, Boeing was granted leave to participate in the case as an intervening defendant, and this court adopted an accelerated schedule for submitting and clarifying the administrative record and for filing cross-motions for judgment on that record in accord with RCFC 52.1. Alabama Aircraft's motions to supplement the administrative record and for discovery were granted with respect to materials previously withheld on grounds of attorney-client privilege and work-product protection, upon a finding of waiver, but were otherwise denied in part. *See Alabama Aircraft,* 82 Fed.Cl. at 774. The parties thereafter reached agreement on supplementation of the administrative record to include the previously withheld materials. *See* Notice of Filing Supplemental Administrative Record, Docket No. 91 (sealed) (August 21, 2008); *see also* Order of August 6, 2008, Docket No. 70 (sealed) (granting motion by Alabama Aircraft and the government for supplementation of the administrative record to include the materials in dispute and establishing protective terms applicable to that inclusion).

## JURISDICTION

This is a post-award bid protest. The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub.L. No. 104–320, §§ 12(a), 12(b), 110 Stat. 3870, 3874–75 (Oct. 19, 1996) (codified at 28 U.S.C § 1491(b)), provides that this court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). This statute further provides that this court "shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded." *Id.* These provisions of the Tucker Act provide this court with jurisdiction over both pre- and post-award bid protests, as well as violations of statutory and regulatory provisions applicable to a procurement. *See American Fed'n of Gov't Employees v. United States,* 258 F.3d 1294, 1300 (Fed.Cir.2001); *RAMCOR Servs. Group, Inc. v. United States,* 185 F.3d 1286, 1289 (Fed.Cir.1999). This post-award bid protest falls squarely with the reach of Section 1491(b)(1), and thus this court has subject matter jurisdiction to adjudicate Alabama Aircraft's claims in this case, subject to the government's and Boeing's contentions that Alabama Aircraft lacks standing to challenge the award of the KC–135 contract to Boeing.

## STANDARDS FOR DECISION

### A. MOTIONS TO DISMISS

As part of the court's threshold jurisdictional inquiry, the court must determine whether the bid protester has standing to

sue. *See Rex Serv. Corp. v. United States,* 448 F.3d 1305, 1307 (Fed.Cir.2006). Alabama Aircraft bears the burden of establishing by a preponderance of the evidence that it has standing to pursue its claims. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Rex Service,* 448 F.3d at 1307; *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1370 (Fed.Cir.2002).

If a material factual dispute arises concerning this court's jurisdiction, the court may conduct proceedings to address the contested jurisdictional issues. *Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1584 (Fed.Cir.1993); *Association of Merger Dealers, LLC v. Tosco Corp.,* 167 F.Supp.2d 65, 69 (D.D.C.2001). In this instance, the court received documentary materials and then held an evidentiary hearing at which relevant witnesses testified about the effect of the sale of Pemco World Air on Alabama Aircraft's financial position, corporate structure, and proposal under the RFP and whether notice was given to the Air Force. *See Lechliter v. United States,* 70 Fed.Cl. 536, 543 (2006) ("[T]he court may look beyond the pleadings and 'inquire into jurisdictional facts' in order to determine whether jurisdiction exists." (quoting *Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.1991))).

### B. *Cross–Motions for Judgment on the Administrative Record*

Under 28 U.S.C. § 1491(b)(4),[34] this court's review of a bid protest is governed by the standards contained in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Under the APA, this court may set aside an agency decision which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A reviewing court should determine whether the agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *abrogated in part by Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (abrogating the portion of *Overton Park* that recognized the APA as an independent grant of subject matter jurisdiction). In accord with these provisions for judicial review, it is axiomatic that a reviewing court cannot "substitute its judgment for that of the agency," *Keeton Corr., Inc. v. United States,* 59 Fed.Cl. 753, 755 (2004) (quoting *Overton Park,* 401 U.S. at 416, 91 S.Ct. 814), and may overturn an agency's contracting decision only if "the procurement official's decision lacked a rational basis; or ... the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1331 (Fed.Cir.2001) (citing *Kentron Haw., Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973)). An agency's contracting decision lacks a rational basis if the agency " 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *Keeton Corr.,* 59 Fed.Cl. at 755 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

▪ To prevail on the merits of a protest, a protestor must succeed not only in demonstrating that the agency actions were not supported by a rational basis or that the procedures used in the procurement were contrary to law, but must also establish that the agency's error actually operated to prejudice the protester in the procurement. *Bannum, Inc. v. United States,* 404 F.3d 1346, 1351 (Fed.Cir.2005); *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057 (Fed.Cir.2000). In bid protest jurisprudence, prejudice is relevant at two distinct portions of a case, "first in analyzing whether the protestor has standing to pursue its

---

**34.** This portion of the statute provides that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5." 28 U.S.C. § 1491(b)(4).

claims and then near the end of the analytical process in determining whether the protestor is entitled to relief." *Systems Plus, Inc. v. United States*, 69 Fed.Cl. 757, 769 (2006). To satisfy the requirement of the second type of prejudice, the protestor must demonstrate "that there was a 'substantial chance it would have received the contract award but for that error.'" *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1331(Fed.Cir.2004) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed.Cir.1996)). If a protestor is able to make these showings, the court "may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2); *see PGBA, LLC v. United States*, 389 F.3d 1219, 1228–229 (Fed.Cir.2004) (listing the factors that a trial court should consider in deciding whether a permanent injunction should be issued).

## ANALYSIS

### I. STANDING

■ The Air Force and Boeing contend that Alabama Aircraft does not have standing, and thus that this court has no jurisdiction over Alabama Aircraft's claims, because it is not an "interested party" under the ADRA. The Federal Circuit has construed the term "interested party" in the ADRA to have the same meaning as it does under the Competition in Contracting Act, 31 U.S.C. §§ 3551–56. *Rex Service*, 448 F.3d at 1307; *American Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed.Cir. 2001).[35] Standing to bring a protest under the ADRA is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *American Federation*, 258 F.3d at 1302. The Federal Circuit has refined its definition of interested party to require a protestor to have a "greater than an insubstantial chance of securing the contract if

successful on the merits of the bid protest." *Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir. 2003).

■ The Air Force and Boeing claim that Alabama Aircraft fails to qualify as an "interested party" because "it is not the same entity that submitted a proposal" and because it lacks adequate financial resources to perform the KC–135 contract. Intervening Def.'s Reply to Pl.'s Opp'n to Def.'s and Intervening Def.'s Mot. to Dismiss at 1–2 ("Intervening Def.'s Reply on Standing"); *see also* Def.'s Mot. to Dismiss at 10. The Air Force further argues that "[i]f Pemco actually wished to change its name, or declare [Alabama Aircraft] a successor in interest to the bid, as [Alabama Aircraft] appears to allege, Pemco should have done so formally so that the Government could determine if its interests are protected." Def.'s Mot. to Dismiss at 11. Alabama Aircraft resists these contentions on the grounds that it is the same corporate entity as Pemco Aeroplex, that the Air Force had notice of the sale of Pemco World Air and the resulting name change, and that it has the financial capability to perform the contract, as evidenced by an audit report prepared in June 2008 by the Defense Contract Audit Agency. Pl.'s Opp'n to Def.'s and Intervening Def.'s Mot. to Dismiss at 10, 19–20 ("Pl.'s Opp'n"). Whether Alabama Aircraft qualifies as an "interested party" and has standing to protest must be addressed as a threshold issue in this case.

### A. Same Legal Entity

In the instant bid protest, the plaintiff submitted its proposal for the KC–135 PDM procurement under the name of Pemco Aeroplex. AR 16–1 (Pemco's Second Proposal). As previously noted, Pemco Aeroplex was a subsidiary of Pemco Aviation. Hr'g Tr. 29:4–8. In addition to Pemco Aeroplex, Pemco Aviation was the parent of Pemco World Air Services and Space Vector Corporation. Hr'g Tr. 29:4–8. In July 2007, Pemco Aviation announced that it was selling

---

35. The Competition in Contracting Act states that "[t]he term 'interested party,' with respect to a contract or a solicitation or other request for offers ..., means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2)(A).

Pemco World Air to an affiliate of Sun Capital Partners, Inc. *See* Hr'g Tr. 32:11–12. The sale was completed in September 2007. Hr'g Tr. 33:2–3. The stock purchase agreement provided the buyer with the exclusive right to use the Pemco name; as a result, the names of Pemco Aviation and Pemco Aeroplex were changed to Alabama Aircraft Industries, Inc. and Alabama Aircraft Industries, Inc.-Birmingham, respectively. Hr'g Tr. 33:10–25.

In response to the sale of Pemco World Air, the articles of incorporation of both Pemco Aviation and Pemco Aeroplex were amended to reflect the new names. Hr'g Tr. 33:14–18, 34:1–2.[36] The amendment to the articles of incorporation changing the name of Pemco Aeroplex to Alabama Aircraft expressly stated that "[a]ll other provisions of the Articles of Incorporation of the Corporation shall remain in full force and effect." Pl.'s Opp'n, Ex. B (Articles of Amendment to the Articles of Incorporation of Pemco Aeroplex, Inc. (Nov. 26, 2007)). The amendments regarding names were the only changes to the corporate bylaws made in response to the sale of Pemco World Air. Hr'g Tr. 34:24 to 35:1, 35:21–23. Additionally, the only changemade to Pemco Aeroplex's central contractor registration was to reflect its adoption of a new name. Hr'g Tr. 36:5–9. The sale of Pemco World Air did not result in any change to Pemco Aeroplex's tax identification number. Hr'g Tr. 36:13–16. And, the sale of Pemco World Air had no effect on Pemco Aeroplex's corporate structure, place of business, employees, or business activities. Hr'g Tr. 35:2–19. The chief result of the sale was to improve the financial resources of Pemco Aviation and Pemco Aeroplex in a very significant way. Hr'g Tr. 78:14 to 79:6.

The Air Force and Boeing seize upon Alabama Aircraft's new status as a small business to argue that Alabama Aircraft "is an entirely different entity," Intervening Def.'s Mot. to Dismiss at 8, and thus "does not have a valid proposal before the Air Force." Def.'s Mot. to Dismiss at 13–14. The posi-

tion asserted by Boeing and the Air Force is not supportable. A change in size does not automatically equate to a company becoming a "new" entity. Here, it is undisputed that at the time the final bids were submitted, Alabama Aircraft was a large business. AR 16–1840 (Pemco's Second Proposal). The fact that Alabama Aircraft's parent company sold one of its subsidiaries after the close of bidding and changed its name does not establish that Alabama Aircraft and Pemco Aeroplex are different entities. The subsidiary that was sold had a different business, maintaining civilian aircraft, at a different location, Dothan, Alabama, and had a completely separate roster of employees. As detailed above, the only effects of the completion of the sale on the entity that submitted a bid for the KC–135 contract were the change in the entity's name and a material improvement in its financial resources.

### B. Same Operations

The sale of the Pemco World Air subsidiary did not affect the operational resources that Alabama Aircraft could devote to the KC–135 PDM contract. Hr'g Tr. 103:1–12. Prior to the sale, Alabama Aircraft did not rely on either the personnel or the assets of Pemco World Air to perform its work. Hr'g Tr. 31:19 to 32:3. Consistent with the separate existence of Pemco World Air and Alabama Aircraft, Pemco World Air had no involvement with the current KC–135 bridge contract. Hr'g Tr. 32:4–10. The sale of Pemco World Air did not affect any of the facilities, equipment, or personnel that were necessary to perform the work contemplated by Alabama Aircraft's proposal. Hr'g Tr. 103:1–12.

Boeing and the Air Force claim that because of the sale of Pemco World Air, "the parent company does not appear to have any of the additional workforce, capabilities, facilities and resources Pemco touted in its proposal and upon which the Contracting Officer relied in finding [Alabama Aircraft] responsible." Intervening Def.'s Reply at 3. Howev-

---

**36.** The articles of incorporation of Pemco Aviation were amended on September 19, 2007 to reflect its new name. Pl.'s Opp'n, Ex. D (Form 8–K filed by Pemco Aviation (Sept. 19, 2007)) at 3; Hr'g Tr. 33:14–18. On November 26, 2007,

Pemco Aeroplex's articles of incorporation were amended to reflect the name change. Pl.'s Opp'n, Ex. B (Articles of Amendment to the Articles of Incorporation of Pemco Aeroplex, Inc. (Nov. 26, 2007)).

er, the several references in the proposal to Alabama Aircraft's parent company's resources connoted only that Alabama Aircraft had the financial support of its parent. Hr'g Tr. 108:16–22. Additionally, both prior to and after the sale of Pemco World Air, the parent company "did not have a touch level workforce" or facilities of its own. Hr'g Tr. 69:16–22. Those resources inhered in Pemco Aeroplex, not Pemco Aviation, and, separately, in Pemco World Air.

Boeing, in its motion to dismiss, relies on the decision in *Emerald Coast Finest Produce Co. v. United States*, 79 Fed.Cl. 466, 470–71 (2007). Intervening Def.'s Mot. to Dismiss at 8–9. However, that decision is inapposite to the present case. The court in *Emerald Coast* found that the protestor no longer had standing to pursue injunctive relief in a bid protest because it had sold assets which were necessary to perform the contract and in connection with that sale had entered into a non-compete agreement. 79 Fed.Cl. at 471. Unlike the situation in *Emerald Coast*, the subsidiary sold by Alabama Aircraft's parent company performed work unrelated to Alabama Aircraft's maintenance on military aircraft and did not affect its ability to perform the contract at issue. Hr'g Tr. 29:9–22, 103:1–12. Alabama Aircraft did not rely on the availability of resources from Pemco World Air in formulating its proposal. AR 8–302 (Pemco Initial Proposal); Hr'g Tr. 107:18–25. Boeing's motion to dismiss fails to explain how the assets sold by Alabama Aircraft's parent corporation were necessary for Alabama Aircraft to perform the contract or that the assets were "necessary to its proposed approach." Intervening Def.'s Mot. to Dismiss at 8–9. The sale of Pemco World Air did not affect the physical resources on which Alabama Aircraft would rely in performing the KC–135 PDM contract.

### C. Enhanced Financial Position

In their motions to dismiss, Boeing and the Air Force strenuously challenge the financial ability of Alabama Aircraft to perform the KC–135 PDM contract. Intervening Def.'s Mot. to Dismiss at 9; Def.'s Mot. to Dismiss at 2. In contesting Alabama Aircraft's financial capability to perform the contract at issue, Boeing relies on the fact that approximately 80% of the company's revenue comes from the current KC–135 bridge contract and that Alabama Aircraft sought a waiver for its 2008 pension payment. Hr'g Tr. 86:2–18, 89:4–7.[37] Boeing claims the perceived financial shortcomings of Alabama Aircraft and its status as a small business preclude it from having an economic interest in the instant contract because Alabama Aircraft "is not the type of contractor to whom the Government awards contracts valued in excess of one billion dollars for services vital to national security." Intervening Def.'s Mot. to Dismiss at 9.

The sale of Pemco World Air provided its parent company with an immediate cash infusion that eliminated an outstanding $30 million debt and provided a $5 million cash reserve. Hr'g Tr. 78:14–19. Prior to the sale of Pemco World Air, the parent company "had no cash and had to borrow the revolver for the quarter ending September of 2007." Hr'g Tr. 78:25 to 79:2. By contrast, at the close of August 2008, Alabama Aircraft had $12.7 million in cash reserves. Hr'g Tr. 78:20–22. A Defense Contract Audit Agency ("DCAA") report completed in June 2008 concluded that the "contractor's financial condition is acceptable for performing on Government contracts. Our examination of [Alabama Aircraft's] financial capability disclosed that it will be capable of performing on its Government contracts in the near-term." BX–1, Tab 3 (DCAA Audit Report (June 13, 2008)) ("2008 DCAA Audit Report") at 2. This report stands in stark contrast to a report prepared by DCAA in February 2007, which predated the sale of Pemco World Air and concluded "the contractor is in an unfavorable financial condition." BX–1, Tab 4

---

**37.** Alabama Aircraft's waiver request remained pending at the time of the hearing on September 4, 2008. Hr'g Tr. 86:4–20. If Alabama Aircraft's waiver request were to be denied, it would be "required to contribute approximately $3.7 million for the 2007 plan year by September 15, 2008." BX–1, Tab 8 (Form 10–Q filed by Alabama Aircraft Industries, Inc. (June 30, 2008)) at 22; *see also* Hr'g Tr. 95:3–9.

(DCAA Audit Report (Feb. 16, 2007)) at 1.[38] Currently, due its increased cash reserves, Alabama Aircraft has sufficient capital both to pay its outstanding pension obligation and begin performance on the KC-135 PDM contract. Hr'g Tr. 96:12–15. Furthermore, if Alabama Aircraft were to be awarded the KC-135 PDM contract, the pertinent state and local governments have pledged an investment of $7.5 million to allow Alabama Aircraft to address "facility infrastructure and personnel resources." AR 16–1 (Pemco's Second Proposal).

### D. Adequate Notice

On May 4, 2007, the contracting officer in this procurement made a determination that the three competitors who submitted an offer were each responsible. AR 46.32–7 (Contracting Officer's Determination of Responsibility). The closure of the sale of Pemco World Air occurred on September 19, 2007, about a week after the original award of the contract to Boeing. Hr'g Tr. 33:2–3; AR 5–23 (Decision Document). In the months preceding the sale, Alabama Aircraft and its parent endeavored to keep the Air Force informed about the pendency of the transaction. PX 4 (E-mail from Randy Shealy to Jean Carter and Lt. Col. Bernard Badami (July 11, 2007)); Hr'g Tr. 76:6–10, 194:19 to 195:2. Prior to GAO's decision of December 27, 2007 in *Pemco Aeroplex I*, Alabama Aircraft informed both Colonel James Nally and Walt Spicer [39] that "Pemco Aeroplex's name has changed to Alabama Aircraft Industries, Inc.-Birmingham" and that Alabama Aircraft was now classified as a small business. PX 1 (E-mail from Glenn Hess, Alabama Aircraft, to Colonel Nally (Dec. 12, 2007)); PX 2 (E-mail from Hess to Spicer (Dec. 12, 2007)).

In addition to his role overseeing all KC-135 PDM work, Colonel Nally was a member of the Source Selection Advisory Council for this procurement. *See* AR 84–7 (Nally Decl.). Also, the Administrative Contracting Officer ("ACO") had notice of the sale of Pemco World Air and the corresponding name change. PX 3 (Defense Contract Management Agency Audit Report Number 1201–2007R10601003 (Dec. 14, 2007)) at cover page.[40] Notwithstanding the Air Force's ample notice of the pending sale of Pemco World Air, the Air Force did not initiate inquiries into the effect, if any, the sale would have on Alabama Aircraft's ability to perform under its proposal. Hr'g Tr. 46:21 to 47:4.[41]

Alabama Aircraft, as it is presently constituted, has not been subject to a responsibility determination. However, DCAA has conducted an audit evaluation of Alabama Aircraft since Pemco World Air was sold. BX 1, Tab 3 (2008 DCAA Audit Report) at 1. Manifestly, a DCAA audit report should not be equated to a contracting officer's responsibility determination.[42] However, the Air Force and Boeing's strongest objection to Alabama Aircraft's ability to perform the KC-135 PDM contract is the company's financial position. Def.'s Mot. to Dismiss at 2 (Alabama Aircraft "does not have the financial resources to perform."); Intervening Def.'s Mot. to Dismiss at 10 (Alabama Aircraft "does not have the financial resources necessary to perform the KC-135 PDM contract[;] . . ., [a] small business cannot possibly be deemed a responsible contractor to perform the instant contract."). The claims of Boeing and the government that the financial posture of Alabama Aircraft would preclude it

---

**38.** DCAA found that Alabama Aircraft's parent company had significantly decreased its long term liabilities while increasing its working capital during the 2007 fiscal year. BX–1, Tab 3 (2008 DCAA Audit Report) at 10.

**39.** Mr. Spicer is an Air Force official with responsibilities in the KC–135 Systems Program office. *See* Hr'g Tr. 46:17–20.

**40.** The Defense Contract Management Agency was assigned the task of monitoring the financial capability of Alabama Aircraft and its parent company. Hr'g Tr. 76:15–16.

**41.** The government's reliance on the provision of the FAR codified at 48 C.F.R. § 42.1203, requiring notification of the contracting officer to approve a name change or a successor-in-interest, is misplaced, as its own brief recognizes: "[w]e acknowledge that this FAR provision is only binding upon an awardee, and Pemco never received the award." Def.'s Mot. to Dismiss at 11.

**42.** The presence of adequate financial resources to support a contractual undertaking is only one of the factors that the FAR instructs the contracting officer to take into account in determining whether a contractor is responsible. *See* 48 C.F.R. § 9.104–1.

from performing the contract make relevant the findings of the recent DCAA audit report. The DCAA's finding that Alabama Aircraft's financial position would allow it to "perform[ ] on its Government contracts in the near-term" stands in stark contrast to the dire circumstances outlined in the briefs of Boeing and the government. BX 1, Tab 3 (2008 DCAA Audit Report) at 2. Notably, DCAA "examined Alabama Aircraft Industries, Inc.'s financial condition and capability to determine if the contractor has adequate financial resources to perform on [g]overnment contracts in the current and near-term (up to one year)." Def. Reply's to Pl.'s Opp'n to Def.'s and Intervening Def.'s Mots. to Dismiss, Declaration of Glenda Cothran (Technical Specialist Auditor with the DCAA (Sept. 2, 2008)) at 2. DCAA's audit report, combined with payments Alabama Aircraft expects to earn on the KC–135 PDM contract, strongly support the conclusion that if awarded the contract, Alabama Aircraft would have sufficient financial resources to perform the PDM work at issue. Hr'g Tr. 82:10–22.[43]

### E. Synopsis

Alabama Aircraft has standing to challenge the Air Force's award of the KC–135 PDM contract because it satisfies the definition of "interested party." Despite its name change and the sale of a sister subsidiary, Alabama Aircraft is the same legal entity as the company that submitted its second final proposal revision in June 2007. Alabama Aircraft has the same operational capabilities as its predecessor and due to the sale to the sister company it is in a stronger financial position to perform the instant contract. Furthermore, the Air Force had ample notice of the sale of the sister company and failed to initiate any inquiries about whether the sale called into question Alabama Aircraft's capabilities to perform the contract. The DCAA audit report completed in June 2008, while not the equivalent of a responsibility determination, confirms that for the near future Alabama Aircraft has sufficient financial resources to perform under the contract. For these reasons, Alabama Aircraft continues to

be an interested party with standing to pursue this bid protest.

## II. PROPRIETY OF THE AIR FORCE'S AWARD

On the merits, the court has focused on Alabama Aircraft's primary challenges to the Air Force's award of a contract to Boeing. Those claims involve alleged organizational conflicts of interest, erroneous past-performance ratings, and a flawed price-realism analysis. A secondary claim, that the Air Force selection officials had inadequate discussions with the offerors, especially Pemco, about the terms of the solicitation, is subsumed in the price-realism discussion.

### A. Organizational Conflicts of Interest

Alabama Aircraft claims that Boeing and its subcontractor, L–3, suffered from disqualifying organizational conflicts of interest ("OCI") because the two companies had "[a]ccess to nonpublic information and influence over the KC–135 PDM program." Plaintiff's Mot. for Judgment on the Administrative Record at 19 ("Pl.'s Mot."). Specifically, Alabama Aircraft avers that Boeing's role as a technical consultant and its work on other government contracts involving the KC–135, when combined with L–3's work at Tinker, provided it with access to nonpublic information regarding the possibility of the Air Force's changing the PDM cycle and more detailed knowledge of the quantity of KC–135s needing contractor PDM. *Id.* at 20. Additionally, Alabama Aircraft argues that Boeing's and L–3's other contracts with the government provided the two companies with the opportunity to steer the government's award of the present contract to themselves. *Id.* at 23–24.

■ For Alabama Aircraft to prevail on its OCI claim, it must establish a violation of a statutory or regulatory provision relating to a conflict of interest. *See Galen Med. Assocs. v. United States,* 369 F.3d 1324, 1335 (Fed.Cir.2004) (citing 18 U.S.C. § 208, 5 C.F.R. § 2635.403(c) (2003), 48 C.F.R. §§ 1–

---

43. In addition, Alabama Aircraft has and has had subcontracts for work on the C–130 and P–3 airframes, as well as on a classified airframe. Hr'g Tr. 67:1 to 68:1, 80:8 to 83:12.

18 (2003)).[44] Based on the FAR provisions governing OCIs, there are three basic situations that give rise to an OCI: "biased ground rules," "unequal access to information," and "impaired objectivity." *Systems Plus*, 69 Fed.Cl. at 770 (quoting Daniel I. Gordon, *Organizational Conflicts of Interest: A Growing Integrity Challenge*, 35 Pub. Cont. L.J. 25, 32 (2005)). Alabama Aircraft alleges that each of these three OCIs was present with this procurement insofar as Boeing was concerned and that the government failed to fulfill its obligation in addressing the OCIs under the FAR. Pl.'s Mot. at 19–24.

The FAR mandates that the contracting officer "[i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible; and ... [a]void, neutralize, or mitigate significant potential conflicts before contract award." 48 C.F.R. § 9.504(a). "The responsibility for determining whether a contractor has a conflict of interest and should be excluded from competition rests with the contracting officer, who must exercise 'common sense, good judgment, and sound discretion' in assessing whether a significant potential conflict exists and in developing appropriate ways to resolve it." *Greenleaf Constr. Inc.*, B–293105.18, B–293105.19, 2006 WL 249626 at *11 (G.A.O. Jan. 17, 2006) (citing 48 C.F.R. §§ 9.504, 9.505; *Aetna Gov't Health Plans, Inc.*, B–254397, 1995 WL 449806, at *8–9 (G.A.O. July 27, 1995)). To prevail under the deferential review employed in examining agency contracting decisions, Alabama Aircraft cannot rely on "mere inference or suspicion of an actual or apparent conflict" but must identify specific facts that support its allegations. *Mechanical Equipment Co.*, B–292789.2, 2003 WL 23782511, at *20 (G.A.O. Dec. 15, 2003).

█ Incumbent status by itself is insufficient to create an OCI. *See Systems Plus*, 69 Fed.Cl. at 771 (citing *Gulf Group, Inc. v. United States*, 56 Fed.Cl. 391, 398 & n. 13 (2003)); *see also WinStar Commc'ns, Inc. v.*

*United States*, 41 Fed.Cl. 748, 763 (1998) (citing *Versar, Inc.*, B–254464.3, 1994 WL 120013, at *7 (G.A.O. Feb. 16, 1994)) ("[A]n offeror's competitive advantage gained through incumbency is generally not an unfair advantage that must be eliminated."). In the instant case, both Boeing and Alabama Aircraft are incumbents. Under the current KC–135 PDM Bridge Contract, Boeing serves as the prime contractor and Alabama Aircraft is its primary subcontractor. Furthermore, from 1994 to 2001, Alabama Aircraft served as the prime contractor for providing KC–135 PDM. *See Alabama Aircraft*, 82 Fed.Cl. at 760. Since 1969, Alabama Aircraft has been performing PDM on the KC–135 fleet and during that time it has completed maintenance on over 2,400 aircraft, which it claims is more than any of its competitors. Compl. ¶ 9.

Alabama Aircraft's claims of an OCI are premised upon Boeing's and L–3's other contracts with the Air Force relating to the KC–135 aircraft. Pl.'s Mot. at 20. The RFP for the instant proposal identified Boeing as a potential technical consultant. AR 4–51 to 4–52 (Solicitation–Request for Proposal). The RFP provided that "Boeing will only be used for technical questions which the Source Selection Team may not be able to answer and those individuals at Boeing who are responsible for answering the questions will sign Non–Disclosure Agreements." AR 4–52 (Solicitation–Request for Proposal). Notwithstanding these representations in the RFP, the government maintains that the Source Selection Team never consulted with Boeing about any aspect of any offeror's proposal. Def.'s Facts at 9 (citing AR 93.1–1658 (Contracting Officer's Statement of Facts)). Because the Air Force never consulted Boeing in connection with this procurement there was no need for any individual to sign the nondisclosure agreement. *See* Def.'s Facts at 9.

Another Boeing contract that Alabama Aircraft cites as creating a potential OCI is Boeing's engineering services contract for the KC–135 aircraft. *See* Pl.'s Mot. at 21–22.

---

**44.** The FAR states that an OCI occurs when "because of other activities or relationships with other persons, a person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage." 48 C.F.R. § 2.101.

The KC–135 aircraft was manufactured by Boeing. AR 84–8 (Nally Decl.). Under the engineering services contract, Boeing was to examine alternative PDM concepts to ensure the continued viability of the KC–135 aircraft. *See, e.g., id.;* Def.'s Facts at 9. Under this contract, "Boeing's input was limited to technical assistance and recommendations concerning the tasks that should be performed at the four-year interval." AR 84–8 (Nally Decl.). This contract involved proposed revisions to the current five-year PDM cycle to shift to "light" PDM every four years and "heavy" PDM every eight years. *See supra,* at 678. The four- and eight-year program is still at the proposed stage and is being evaluated for possible implementation. *See* AR 84–8 (Nally Decl.). It was not reflected in the solicitation at issue.

Lastly, Alabama Aircraft claims that Boeing's subcontractor on its proposal, L–3, may have passed along to Boeing information it obtained as a subcontractor working at Tinker Air Force Base. Pl.'s Mot. at 23. L–3's work at Tinker consists of serving as a subcontractor to Battelle. AR 93.1–1658 (Contracting Officer's Statement of Facts). In its role as subcontractor, L–3 has been providing technical expertise regarding proposed modifications to Tinker's organic KC–135 PDM program. *Id.* (stating that L–3's "expertise was being provided to improve Tinker's organic line, not to learn from the Government or to shape the Government's contract PDM effort").[45] According to the contracting officer, "L[-]3 has never been a consultant for the SSET [Source Selection Evaluation Team], nor have they been asked by the team, either directly or indirectly, for information, nor have they had any influence on the decision makers in this source selection." *Id.* And, to eliminate the potential for L–3 to share proprietary government information with Boeing, the Air Force required L–3 employees to sign a non-disclosure agreement before they were permitted to

begin examining Tinker's organic KC–135 PDM program. *Id.*[46]

### 1. Biased ground rules.

■ "Biased ground rules" arise when a government contractor "has ... set the ground rules for another government contract by, for example, writing the statement of work or the specifications." *Aetna Gov't Health Plans,* 1995 WL 449806, at *8; *See* 48 C.F.R. §§ 9.505–1, 9.505–2. Such a contractor would have an unfair competitive advantage because it would have ample opportunity to tilt the competition in its favor and would possess a unique understanding "of the agency's future requirements." *Aetna Gov't Health Plans,* 1995 WL 449806, at *8.

■ Alabama Aircraft claims that Boeing's engineering and service contract on the KC–135 and L–3's involvement as a subcontractor in evaluating the Air Force's in-house KC–135 PDM program allowed them to "set the ground rules for this procurement." Pl.'s Mot. at 24. However, there is no evidence in the administrative record indicating that Boeing or L–3 was involved in either drafting the statement of work or establishing the specifications for this procurement. Accordingly, there are no "hard facts" in the administrative record supporting Alabama Aircraft's claim of a "biased ground rules" OCI. *See CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1582 (Fed.Cir.1983). Thus, Alabama Aircraft has failed to sustain its burden of proving a "biased ground rules" OCI.

### 2. Impaired objectivity.

■ An "impaired objectivity" OCI occurs where a government contractor's "work under one government contract could entail its evaluating itself, either through an assessment of performance under another contract or an evaluation of proposals." *Aetna Gov't Health Plans,* 1995 WL 449806, at *9 (citing

---

**45.** In addition, L–3 provides maintenance services for the Air Force on a sister aircraft, the RC–135, at a facility located in Greenville, Texas. Hr'g Tr. 136:2–20.

**46.** The non-disclosure agreement provides that L–3 employees "agree[d] not to use data obtained from the Government or from another

contractor working on [this contract] for any purpose other than performance under this contract, nor ... make this information available to anyone not assigned to work on this contract.... [A]ny other use of th[ese] data is expressly forbidden." AR 93.1–1658 (Contracting Officer's Statement of Facts).

48 C.F.R. § 9.505–3). Alabama Aircraft claims that an "impaired objectivity" OCI existed because Boeing's and L–3's contracts allowed them to simultaneously serve as both competitors and advisors in this procurement. Pl.'s Mot. at 23. However, L–3's work as a subcontractor at Tinker and Boeing's engineering services contract did not involve evaluations of proposals responding to the RFP at issue. And, Boeing's proposed role as a consultant for this procurement never actually materialized. Def.'s Facts at 9 (citing AR 93.1–1658 (Contracting Officer's Statement of Facts)). As a result, Alabama Aircraft has failed to sustain its burden of identifying the necessary specific facts to support its claim of an "impaired objectivity" OCI.

### 3. Unequal access to information.

 Alabama Aircraft claims that Boeing had access to nonpublic information concerning variations from the Air Force's BEQ of the number of KC–135s needing contractor PDM. Pl.'s Mot. at 21. Specifically, Alabama Aircraft contends that Boeing's and L–3's other contracts relating to the KC–135 aircraft caused them to know that more KC–135s would need contractor PDM than the number represented by the Air Force's BEQ. Id. at 22. Additionally, Alabama Aircraft avers that Boeing's engineering contract provided it with nonpublic information regarding the potential that the Air Force might implement changes in the current PDM cycle during the instant contract's option years and that this knowledge allowed Boeing to tailor the pricing terms of its proposal. Id. at 21–22. Boeing resists these allegations, asserting that it had no such nonpublic information and that the administrative record does not support Alabama Aircraft's claims. Intervening Def.'s Cross–Mot. for Judgment on the Administrative Record at 29–30 ("Intervening Def.'s Cross–Mot.").

An "unequal access to information" OCI has been described as a situation where a firm has access to nonpublic information as part of its performance of a government contract and where that information may provide the firm a competitive advantage in a later competition for a government contract. FAR § 9.505–4. In these "unequal access to information" cases, the concern is limited to the risk of the firm gaining a competitive advantage; there is no issue of bias.

*Aetna Gov't Health Plans,* 1995 WL 449806, at *9. To prevail on an OCI claim of "unequal access to information," it is axiomatic that the government contractor must have access to "the kind of specific, sensitive information that would create an OCI." *See Systems Plus,* 69 Fed.Cl. at 772. Thus, for a bid protester to succeed on an "unequal access to information" OCI claim, it must demonstrate "the awardee was 'in the unique position of [ ] having access to information to which no other offeror had access.'" *Id.* at 771 (quoting *Johnson Controls World Servs., Inc.,* B–286714.2, 2001 WL 122352, at *5 (G.A.O. Feb. 13, 2001) (finding that an "unequal access to information" OCI existed when the incumbent had access to a database that provided more detailed information about the procurement than was available in the public domain)).

 In recent years, Tinker Air Force Base has sought to increase the number of KC–135s maintained at its facility, in part to satisfy a "50/50" objective of the Department of Defense that 50 percent of the work be accomplished at an organic facility rather than through a contractor. *See* Hr'g Tr. 145:4–7; AR 65–2 (Air Force Talking Paper). L–3's involvement as a subcontractor in improving Tinker's organic PDM process was directed toward improving Tinker's PDM operations and achieving that goal. The Air Force has repeatedly stated that the BEQ in this procurement is 24 aircraft per year. AR 46.12–1581 (Amendment No. 4 to RFP (May 31, 2006) (restating BEQs)); AR 84–7 (Nally Decl.); Tr. 144:16–18.[47] The maximum quan-

---

47. A court reviewing an agency's contracting decisions presumes that the government officials acted in good faith and with honesty. *See, e.g., Spezzaferro v. Federal Aviation Admin.,* 807 F.2d 169, 173 (Fed.Cir.1986). To overcome that presumption, Alabama Aircraft would have to point to specific evidence that during the procurement the Air Force knew its BEQ was more than 24. *See Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234, 1240 (Fed.Cir.2002). In

tity stated was 60 aircraft per year, *See* AR 46.12–1580 (Request for Proposal, Amendment 4 (May 31, 2006)) ("The maximum quantity of 60 A/C will remain unchanged."), but that quantity was subsequently revised downward to 48 aircraft per year. AR 46.12–1584 (Request for Proposal, Amendment 5 (July 12, 2006)).

It was well known to Alabama Aircraft and Boeing, both of whom were and are performing under the current bridge contract, that Tinker was having difficulty in meeting its targeted goals for organic PDM. Among other things, to increase its efficiency and productivity, Tinker would have to modify its hangar by adding additional doors, but such a change would be problematic, because the hangar is listed as an historic building. Hr'g Tr. 137:17 to 138:16. Both Boeing and Alabama Aircraft participated in briefings where PDM needs were addressed by those involved in the activity, and they both accordingly knew of Tinker's problems. *See* AR 84–13 (Agency Request in B–310372.4, Ex. 3 (Programmed Depot Maintenance Combined Program Management Review (March 2007) at 6–7)); AR 84–17 to 84–21 (*id.*, Ex. 4 (Briefing Slides: Four/Eight Year PDM Program)). Nonetheless, Alabama Aircraft sees confirmation of their allegation in Boeing's pricing structure, which had a[* * *] price for performing PDM for [* * *] aircraft than it did for [* * *] aircraft. *See* AR 93.1–1110 (Boeing Second Final Proposal Revision Pricing Model). Alabama Aircraft claims Boeing's insider knowledge of the Air Force's true contractor PDM needs allowed it "to price PDM at the BEQ pricing band relatively low, in order to win the contract, with a relatively higher price at the [* * *] quantity band, so that it would be paid more." Pl.'s

Mot. at 22. That claim is unavailing. The record does not establish that Boeing had nonpublic information about the "true" quantity of PDM work the Air Force would require, such that it could shape its offer in an advantageous way. Both Boeing and Alabama Aircraft had an incumbent's knowledge of the circumstances involved with the organic PDM line at Tinker and what that meant for the related PDM work to be carried out by a contractor.

Alabama Aircraft's argument that Boeing possessed nonpublic information about potential changes to the PDM cycle rests on a different foundation. It is undisputed that Boeing was assisting the Air Force in exploring alternatives to the current five-year PDM program. Pl.'s Mot. at 21; Def.'s Facts at 9–10. Boeing's engineering services contract with the Air Force required Boeing to perform "the day to day maintenance of the KC–135 weapon system platform and to develop modifications to the KC–135 to ensure the continued service life of the KC–135." Def.'s Facts at 9.[48] Alabama Aircraft claims that Boeing's work under this contract in exploring potential alternatives to the current PDM cycle permitted it to obtain nonpublic information about the likelihood that the Air Force would switch to another cycle during the life of the contract at issue. Pl.'s Mot. at 21. As Alabama Aircraft would have it, this inside information would "allow Boeing to, among other things, propose more aggressive pricing through a reduction in labor hours for [* * *] years in the contract." *Id.* at 22. Alabama Aircraft claims that Boeing's decision to embrace [* * *] learning for [* * *] and to offer significant price discounts in the [* * *] years of the contract is evidence that Boeing had access to nonpublic information

support of its argument that the BEQ underestimated the Air Force's contractor PDM needs, Alabama Aircraft relies heavily upon a slide from a Program Management Review presentation that occurred a few days after the confirmation of the award to Boeing. *See* AR 74–26 (Pemco's Supplemental Bid Protest, B–310372.4 (Mar. 21, 2008)). Alabama Aircraft also seeks to have admitted into the administrative record a declaration from their representative at the March 2008 Program Management Review concerning the potential need for increased contractor PDM. Pl.'s Mot. to Supplement the Administrative Record, Ex. A (Decl. of Jim Tuck) (Aug. 7, 2008).

Without more, this indicator is insufficient to contravene the government's repeated statements that the BEQ remains 24. In that respect also, Mr. Tuck's declaration will not be added to the administrative record.

48. To the extent that Boeing's engineering services contract with the Air Force is a design and development contract, the prohibitions on OCI contained in the FAR are inapplicable. 48 C.F.R. § 9.505–1(a); *see also Vantage Assocs., Inc. v. United States,* 59 Fed.Cl. 1, 11–12 (2003).

about the future work requirements for the PDM program. *Id.*

In its response to these allegations, Boeing relies on the declaration submitted by Colonel Nally in the GAO proceeding that addressed Alabama Aircraft's claims. Intervening Def.'s Cross–Mot. at 30. However, Boeing's reliance on that declaration is misplaced. The court in its prior opinion expressly stated that Colonel Nally's declaration was "a *post hoc* addendum to the contemporaneous administrative record." *Alabama Aircraft Indus.*, 82 Fed.Cl. at 768 n. 12.

Nonetheless, despite the inapplicability of Colonel Nally's declaration, Alabama Aircraft has failed to meet its burden of identifying specific facts showing that Boeing had an "unequal access to information" OCI. Both Boeing and Alabama Aircraft were present at a March 2007 Management Review that discussed the potential change to four- and eight-year PDM cycles. AR 84–13 (Agency Request in B–310372.4, Ex. 3 (Programmed Depot Maintenance Combined Program Management Review (March 2007) at 6–7)); AR 84–17 to 84–21 (*id.*, Ex. 4 (Briefing Slides: Four/Eight Year PDM Program)). Thus, both Boeing and Alabama Aircraft had notice prior to the submission of their second final proposal revisions that the Air Force was considering altering the current PDM cycle. It is well-established that an appropriate measure for an agency to take to remedy a potential "unequal access to information" OCI is to disclose the nonpublic information. *See Sierra Military Health Servs., Inc. v. United States*, 58 Fed.Cl. 573, 583 (2003). Here, the Air Force's briefing in March 2007 served to alert both competitors to the Air Force's internal deliberations that previously may have been known only to Boeing. That disclosure served to level the playing field.

In sum, Alabama Aircraft has failed to sustain its burden of identifying the requisite facts in the administrative record to support its claim that Boeing had an "unequal access to information" OCI.

*B. The Air Force's Evaluation of Past Performance.*

▇ Under the "past performance" criterion of the RFP, the Air Force's Performance Confidence Assessment Group ("PCAG") undertook to evaluate the likelihood that each competitor for the contract could successfully perform under the terms of its offer given its prior and present performance on relevant government contracts. *See* AR 4–83 (Solicitation–Request for Proposal). The Air Force specifically indicated that it would evaluate each "[o]fferor's demonstrated record of contract compliance in supplying products and services that meet user's needs, including cost and schedule." *Id.* Prior contracts were weighed for relevancy according to how closely they correlated to the type of effort, complexity, and essential components involved in the proposed contract. *Id.* The Air Force sought to examine "general trends in the contractor's performance," *id.*, and to develop "an *overall evaluation* of [o]fferor performance" with relevant contracts. AR 4–84 (Solicitation–Request for Proposal) (emphasis added).

An offeror could receive various performance confidence assessments ranging from "high confidence" to "no confidence." AR 4–84 (Solicitation–Request for Proposal). An assessment of "satisfactory confidence" would indicate that "[b]ased on the [o]fferor's performance record, the government has confidence the [o]fferor will successfully perform the required effort. Normal contractor emphasis should preclude any problems." *Id.* A lower assessment of "little confidence" would indicate that "[b]ased on the [o]fferor's performance record, substantial doubt exists that the [o]fferor will successfully perform the required effort." *Id.*

Ultimately, the Air Force assigned both Boeing and Alabama Aircraft an overall confidence assessment of "satisfactory" based upon their past performance. AR 5–19 (Decision Document). Although both offerors received a rating of "satisfactory" confidence, the Air Force "considered Pemco to have a better past performance record than Boeing." AR 5–22 (Decision Document). The Air Force found that Boeing was "currently delivering aircraft on-time and with accept-

able quality on the KC–135 PDM, KC–10, and C–17 GSP [Globemaster Sustainment Partnership] programs," and thus declined to lower Boeing's assessment from "satisfactory confidence" to "little confidence," despite finding Boeing's performance on these three contracts "troubling." AR 5–19 (Decision Document). Alabama Aircraft contends that the Air Force erred in finding that Boeing's past performance satisfied the standards for "satisfactory confidence." Pl.'s Mot. at 26. Alabama Aircraft asserts that the Air Force deviated from the criteria set forth in the RFP and the FAR by "narrowly focus[ing] on technical performance issues, ignor[ing] the critical issues of ethics and integrity, and fail[ing] to perform an 'overall evaluation' of Boeing's past performance." Id. at 25.

### 1. Boeing's prior relevant contracts.

The Air Force evaluated five contracts that it found to be relevant to Boeing's past performance. AR 33–1 (Boeing Past Performance Worksheets). Several of these contracts were deemed to be "very relevant;" they include Boeing's 1998 KC–135 PDM contract, id., on which Alabama Aircraft focuses the court's attention. Alabama Aircraft cites [* * *] in Boeing's management and modification of this contract. AR 33–6 (Boeing Past Performance Worksheets); Pl.'s Mot. at 10–12. In addition, the Air Force evaluated alleged [* * *] by Boeing with respect to two other specific contracts: the KC–10 Contractor Logistics Support ("CLS") contract, and the C–17 Globemaster Sustainment Partnership ("GSP") contract. AR 33–5, 33–9, 33–48 (Boeing Past Performance Worksheets). The issues are described in a letter dated May 17, 2007 from Air Force Deputy General Counsel [* * *]. See AR 6–271 to AR 6–272 (Proposal Analysis Report/Price Competition Memorandum, Ex. A ("[* * *] Letter")).

Boeing acknowledges that "a review of past performance reveals [* * *] problems on the 'Very Relevant' KC–135 PDM contract." Def.'s Facts at 29–30; see also AR 2–8 to 2–9 (Contracting Officer's Statement of Facts). The KC–135 contract was awarded to Boeing by the Air Force on October 9, 1998. AR 3–59 (DODIG Report). Boeing

submitted a $119 million request for equitable adjustment of this contract on May 7, 2001, and it was ultimately paid $35.8 million upon the settlement of this request. AR 3–62 (DODIG Report). Air Force Deputy Assistant Secretary Darlene Druyun was heavily involved in the decision to approve the equitable-adjustment settlement and to eliminate the Air Force's review of O & A work requests of less than 75 hours. Id. Rather than wait for the final recommendations of a DCAA review of Boeing's proposed request, the Air Force, under Ms. Druyun's influence, "went ahead and submitted an offer to [Boeing] to pay the full $35.8 million settlement" and to approve the contract restructuring. Id. The DODIG Report concluded that "[h]ad the AFNT [Air Force Negotiating Team] used the final DCAA recommended rate adjustments, the REA [request for equitable adjustment] settlement potentially could have been reduced by another $4.5 million." AR 3–63 (DODIG Report).

The DODIG report found that Boeing "appeared to split contract tasking into work units smaller than 75 hours presumably to avoid justifying the reasonableness of the work to DCMA [Defense Contract Management Agency] personnel." AR 3–63 (DODIG Report). Boeing had submitted 4,211 O & A work requests of fewer than 75 hours during the first three quarters of FY 2001, but then sought 88,524 such work requests during FY 2002. Id. A DCMA audit reviewing the results under KC–135 contract found indications of "deliberate inflation of manhour estimates." AR 33–44 (Boeing Past Performance Worksheets).

The government attributes the problems with the KC–135 contract to both Boeing and Pemco. Def.'s Facts at 30–31 (citing AR 2–8 to 2–9 (Contracting Officer's Statement of Facts)). However, the primary issue with the negotiation of the settlement of the KC–135 contract was Boeing's improper relationship with Air Force Deputy Assistant Secretary Darlene Druyun. See AR 3–59 (DODIG Report). Ms. Druyun

wielded influence over billions of dollars in contract awards, modifications and settlements. In 2000, Boeing, at Druyun's request, hired Druyun's daughter and future

son-in-law. Then in 2002, Sears, who at the time was Boeing's CFO, recruited Druyun for an executive position with the company. During this period, 2000 through 2002, Druyun was responsible for dozens of Boeing contracts, including the controversial $23 billion procurement to lease a fleet of KC–767 aerial refueling tankers that has since been canceled.

AR 78–136 (Department of Justice Press Release (July 30, 2006)) (announcing civil settlement with Boeing). These abuses led to an Interim Administrative Agreement between the Air Force and Boeing and civil and criminal settlement agreements. Moreover, the Air Force's attempt to link Pemco to the problems with the KC–135 contract is contradicted by the DCMA audit, which found that "Boeing has demonstrated a somewhat hands-off management of PEMCO ... Boeing and PEMCO operated almost as two independent organizations up until approximately 2005.... A lack of communication between Boeing and PEMCO is indicated, supported by data that suggests that PEMCO was not included in daily standup meetings with Boeing and the Government until 2004–2005." AR 33–44 (Boeing Past Performance Worksheets). In short, Boeing was primarily responsible for the problems with the KC–135 contract.

The Air Force also identified a series of less severe problems concerning some of Boeing's other relevant contracts. On all of the [* * *] inspected by DCMA, there were significant problems identified with the [* * *]. Def.'s Facts at 38; AR 33–9 (Boeing Past Performance Worksheets). And, a letter from Deputy General Counsel [* * *] found evidence to support allegations that Boeing "[* * *]." AR 6–271 ([* * *] Letter). The Air Force concluded that these problems "[* * *] and that Boeing" "[* * *] them." AR 33–9 (Boeing Past Performance Worksheets).

Deputy General Counsel [* * *]'s letter reports that with respect to the KC–135 and C–17 contracts, "Boeing acknowledges that [it][* * *]." AR 6–271 ([* * *] Letter). Regarding [* * *], Boeing admitted that "[* * *]." AR 93.1–1466 (Boeing's Response to [* * *] Letter (June 22, 2007)). In its

PCAG Report, the Air Force described Boeing's conduct on this contract as "[* * *]." AR 33–56 (Boeing Past Performance Worksheets).

### 2. The Air Force's evaluation.

The Air Force based its confidence assessment on information from four sources: the offerors' own records of past and present performance, Contractor Performance Assessment Reports (CPARs), questionnaires sent to program managers and contracting officers, and interviews with program managers and contracting officers. See AR 6–17 (Proposal Analysis Report/Price Competition Memorandum). Alabama Aircraft maintains that the Air Force failed to analyze proper records in its source selection process and thus failed to discern "the notion that Boeing's pattern of misconduct clearly demonstrated its unsatisfactory history of past performance." Pl.'s Reply in Support of its Mot. for Judgment ... and Opp'n to Def.'s and Intervening Def.'s Cross–Mots. ("Pl.'s Reply") at 32. Alabama Aircraft additionally claims that the Air Force "blatant[ly] disregard[ed] ... credible, accessible, and relevant information regarding past performance" that it could have obtained by "picking up the telephone and speaking with" parties such as the Air Force's [* * *]. Id. at 33. The government responds that "the record is replete with documentation ... that the PCAG's review considered the negative past performance information ... [and] adjusted Boeing's Past Performance score accordingly." Def.'s Cross–Mot. at 23 (citing AR 75–150 (Hearing Transcript, B–310372.1)). In making its determination of satisfactory confidence in Boeing's past performance, the Air Force PCAG examined 14 Boeing contracts, 51 CPARs, and 35 questionnaire responses. AR 33–1 (Boeing Past Performance Worksheets). The Air Force evaluated Boeing's past performance in accordance with the criteria set forth in Section M of the RFP. The PCAG chair and the contracting officer considered the problems raised in the [* * *] letter and in Boeing's response to that letter, with respect to both the past performance determination and the related but separate responsibility determination. See AR 75–11 to 75–12, AR 75–28, AR 75–47 to 75–48, AR

75–104 to 75–107, AR 75–150 to 75–154 (Hearing Transcript, B–310372.1). The PCAG interviewed the administrative and procurement contracting officers of the KC–135, KC–10, and C–17 programs regarding the negative past performance issues addressed above. AR 75–54 to 75–55 (Hearing Transcript, B–310372.1). And, the Air Force explicitly asked Boeing "to provide additional information regarding their ethics and integrity in regard to the [KC–135 and KC–10] contracts," among other things, by sending evaluation notices to Boeing on these issues. AR 93.1–1643 (Contracting Officer's Statement of Facts).

The problems that arose with the KC–135 PDM, KC–10 PDM, and C–17 GSP contracts were, the government contends, addressed by the Air Force's PCAG "primarily in the context of program management, [as] one aspect of the larger integrated past performance assessment within a larger still overall source selection evaluation." Def.'s Reply at 10. During this process, the negative performance history associated with these contracts was incorporated into Boeing's performance ratings on these individual contracts. *See* AR 33–5, 33–30, 33–48 (Boeing Past Performance Worksheets). On the past performance subfactor of Depot Maintenance, Boeing's rating on the KC–10 contract was reduced from "[* * *]" to "[* * *]," and on the subfactor of Program Management, Boeing's rating on the KC–10 contract was reduced from "[* * *]" to "[* * *]." AR 75–151 (Hearing Transcript, B–310372.1). The PCAG also reduced Boeing's Program Management rating on the KC–135 contract from "[* * *]" to "[* * *]." *Id.* The Air Force never changed Boeing's rating for Program Management on the C–17 contract. AR 75–158 (Hearing Transcript, B–310372.1).

In the PCAG's final assessment of Boeing's past performance, the Air Force emphasized Boeing's problems under prior relevant contracts:

[* * *].

AR 6–75 (Proposal Analysis Report/Price Competition Memorandum). Before granting Boeing the confidence assessment of "satisfactory," the Air Force summarized its negative past performance assessment of the KC–135, KC–10, and C–17 contracts:

> Evidence suggests that while Program Management performance improves over time, issues are addressed only after some level of official [g]overnment intervention and recent data indicates a significant, negative trend in multiple aspects of Program Management.

AR 6–76 (Proposal Analysis Report/Price Competition Memorandum).

3. *Relationship of the Air Force's "responsibility" determination and its past performance evaluation.*

Alabama Aircraft objects to what it characterizes as the Air Force's "irrational conclusion that the Boeing/Druyun ethical misconduct on the KC–135 PDM contract was somehow irrelevant" to the past performance assessment and claims that "nowhere in the PCAG report is the overall impact of Boeing's pattern of ethics and compliance lapses expressly considered." Pl.'s Mot. at 15. These claims bear on the relationship of the Air Force's "responsibility" determination with its past performance evaluation.

The RFP provided that the Air Force, in its overall evaluation of past performance, would "focus[ ] on . . . the Mission Capability subfactors." AR 4–84 (Solicitation–Request for Proposal). Nonetheless, in the RFP, the Air Force:

> reserve[d] the right to evaluate a contractor['] past performance that may not [be] directly linked to Mission Capability (e.g., contractor's record of conforming to contract requirements and to standards of good workmanship; the contractor's record of forecasting and controlling costs; the contractor's adherence to contract schedules, including administrative aspects of performance; the contractor's history of reasonable and cooperative behavior and commitment to customer satisfaction; and in general, the contractor's business-like concern for the interest of the customer).

AR 4–84 (Solicitation–Request for Proposal). Alabama Aircraft infers a requirement to consider ethics and integrity issues in past performance from the fact that the RFP instructed the Air Force to review "contract

compliance" and the "probability of successfully performing." Pl.'s Reply at 30 (citing AR 4–83 (Solicitation–Request for Proposal)). The FAR, however, draws a distinction between a past performance evaluation and a responsibility determination, providing that

[p]ast performance information is one indicator of an offeror's ability to perform the contract successfully. The currency and relevance of the information, source of the information, context of the data, and general trends in contractor's performance shall be considered. This comparative assessment of past performance information *is separate from the responsibility determination* required under Subpart 9.1.

48 C.F.R. § 15.305(a)(2)(i) (emphasis added). The responsibility determination to be made under FAR Subpart 9.1 implements the government's policy that "[p]urchases shall be made from, and contracts shall be awarded to, responsible prospective contractors only." 48 C.F.R. § 9.103(a). One prong of the responsibility determination involves an inquiry into whether the prospective contractor has "a satisfactory record of integrity and business ethics." 48 C.F.R. § 9.104–1(d).

The PCAG described the Darlene Druyun matter "as a closed issue outside of past performance ... outside of our PCAG perspective in regards to how we evaluate a contract." AR 75–185 & 186 (Hearing Transcript, B–310372.1). The PCAG reviewer described the difficulty of assessing an ethics issue within the range of mission capability factors typically associated with past performance evaluations:

When we look at our mission capability subfactors trying to—trying to pigeon hole that whole issue into that was a little problematic. How do I fit Darlene Druyun into transition or program management or small business? It didn't—the closest it would ever reach would be program management, and that would be a far cry, especially considering the way we evaluated program management against each individual offeror.

AR 75–186 (Hearing Transcript, B–310372.1).

Alabama Aircraft objects that "[t]he Air Force's failure to review Boeing's Past Performance with regard to the Druyun [m]atter

and to even obtain any evidence with which to review this matter is an independent and sufficient ground to sustain a protest." Pl.'s Reply at 31. But the Federal Circuit has articulated a standard under which "the test for reviewing courts is to determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Impresa Construzioni*, 238 F.3d at 1332–33 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir.1994)). Here, the court finds that the Air Force was within its discretion to limit its analysis of the mission capability subfactors to the issues traditionally addressed in past performance evaluations. Additionally, the court finds that the Air Force has provided a reasonable explanation for why and how it considered ethics and integrity issues in the context of its responsibility determination. *See* 48 C.F.R. § 9.104–1 ("To be determined responsible, a prospective contractor must ... (d) [h]ave a satisfactory record of integrity and business ethics.").

### 4. Boeing's implementation of its Interim Administrative Agreement with the United States.

In the aftermath of the Druyun-related events and other controversies involving Boeing's prior contracts with the Air Force, Boeing entered into an Interim Administrative Agreement with the Air Force on September 22, 2004. Def.'s Facts at 35; AR 79–77 (Interim Administrative Agreement). In addition, Boeing paid $565 million as part of a civil settlement and $50 million as part of a criminal settlement to resolve the Druyun matter. Def.'s Facts at 33. The Interim Administrative Agreement imposed several requirements upon Boeing, including the retention of a group to conduct an independent review of Boeing's ethics and compliance policies, the appointment of a special compliance officer, and the submission of quarterly reports to the Air Force. AR 79–90 to 79–93 (Interim Administrative Agreement).

Alabama Aircraft argues that the compliance program and the other legal requirements under the Interim Administrative Agreement prevent Boeing from satisfying

the RFP's definition of "satisfactory confidence," which required "normal contractor emphasis," because

> whether it is termed "extraordinary," "heightened," "elevated," "intense," "concentrated," or "special," the indisputable fact is that the I[nterim Administrative Agreement] imposed on Boeing's performance of its contracts something more than "normal contractor emphasis."

Pl.'s Reply at 22. Alabama Aircraft contends that heightened contractor emphasis applied to each of the contracts rated as "very relevant" in the Air Force's review of Boeing's past performance. *Id.* at 22–23.

The definition of the "satisfactory" confidence assessment in the RFP specifies that "[n]ormal contractor emphasis should preclude any problems." AR 4–84 (Solicitation–Request for Proposal). Alabama Aircraft construes this definition to "preclude application of the 'Satisfactory' rating to a contractor" who is experiencing " 'any problems.' " Pl.'s Reply at 21. The government responds that the criterion means, in "laymen's terms, can they do the work … can the contractor do what we're asking them to do." Hr'g Tr. 294:19, 297:10–11. The government argues that a confidence assessment below "satisfactory" applies "if substantial doubts exist that the offeror will successfully perform the required effort." Hr'g Tr. 297:16–18.

The Air Force neither adopted nor applied the "preclude any problems" criterion urged by Alabama Aircraft. The PCAG Chair indicated that "there's positive and negative past performance in all offerors." AR 75–159 (GAO Transcript, B–310372.1). In this instance, the Air Force was well aware of the blemishes attendant to Boeing's prior work on aircraft maintenance contracts, and it took those flaws into account in its past performance rating of Boeing. *See* AR 33–65 to 33–71 (Boeing Past Performance Worksheets). Nor should the Air Force have concluded that the Interim Administrative Agreement precluded Boeing from satisfying the RFP's requirement of "normal contractor emphasis." That Agreement was prompted by spe-

cific misconduct, but the resulting compliance program has a counterpart in the FAR. *See* 48 C.F.R. § 522.203–13 (mandating the institution of compliance programs for large contractors as part of the Contractor Code of Business Ethics and Conduct). Such ethics and compliance programs do not "prohibit allegations of misconduct from arising; they require contractors like Boeing to have systems in place to investigate and report them when they do arise." Intervening Def.'s Reply at 17. Although many of the problems with Boeing's contracts occurred after the implementation of the Interim Administrative Agreement, the Agreement is insufficient support for Alabama Aircraft's contention that the Air Force erred in awarding Boeing a past performance rating of "satisfactory."

The court finds that the blemishes in Boeing's prior work were fully taken into account by the Air Force and that the Air Force was not arbitrary in assigning Boeing a "satisfactory" confidence assessment, albeit at the lower end of the "satisfactory" range. *See* AR 5–22 (Decision Document). The Air Force's decision to assign Boeing this confidence assessment was within the "zone of acceptable results in a particular case" because it resulted from "a process which 'consider[ed] the relevant factors' and [wa]s 'within the bounds of reasoned decision making.' " *JWK Int'l Corp. v. United States,* 52 Fed.Cl. 650, 654 n. 8 (2002) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)), *aff'd,* 56 Fed. Appx. 474 (Fed.Cir.2003).

*C. The Air Force's Consideration of Price*

■ Alabama Aircraft further contests the award to Boeing on the ground that the Air Force's price-realism analysis was flawed. Pl.'s Mot. at 31.[49] Alabama Aircraft focuses primarily upon Boeing's decision to project and apply [* * *] learning in its final proposal to reduce its overall price and the Air Force's price-realism analysis that accepted that price. *Id.* at 31–32. Alabama Aircraft emphasizes that the Air Force failed

---

**49.** The discussion of the Air Force's price-realism analysis will address Alabama Aircraft's allegations regarding the failure of the agency to hold

adequate discussions regarding the role aging aircraft played in the solicitation.

to account for the increased maintenance needs of an aging KC–135 fleet when it evaluated Boeing's projected efficiency gains over [* * *]. *See id.* at 34–35.

FAR lacks an explicit directive to contracting agencies mandating the use of any particular analytical tool in evaluating the reasonableness and realism of an offeror's price. *See* 48 C.F.R. § 15.404–1(b)–(e). In these circumstances, courts have accorded contracting agencies considerable leeway in evaluating price. *See, e.g., Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir. 1989); *International Outsourcing Servs. v. United States,* 69 Fed.Cl. 40, 48 (2005) (stating that " 'the nature and extent of an agency's price realism analysis are matters within the agency's discretion' ") (citation omitted). However, that discretion can be abused. An agency's price-realism analysis lacks a rational basis if the contracting agency, for example, made "irrational assumptions or critical miscalculations." *OMV Med., Inc. v. United States,* 219 F.3d 1337, 1344 (Fed.Cir.2000).

The RFP stated that the government would employ a "best value approach" in determining the winner of the solicitation. AR 4–78 (Solicitation–Request for Proposal). This approach seeks to award the contract "to an offeror who gives ·the Air Force the greatest confidence it will best meet our requirements affordably." *Id.* Although the combination of the other three evaluation factors were weighted more heavily, price was still a substantial factor in determining which offeror would be awarded the contract. AR 4–79 (Solicitation–Request for Proposal). The fact that Boeing's total evaluated price was approximately $15 million less than Alabama Aircraft's price was one of the main reasons why the Air Force awarded the contract to Boeing. AR 5–22 (Decision Document); AR 59–27 (Source Selection Decision Document).[50]

The RFP required the offerors to provide "labor, fringe benefits, overhead and G & A [General and Administrative] rates" to enable the Air Force to conduct a price-realism analysis. AR 4–63 (Solicitation–Request for

Proposal); *see also* AR 4–86. In this instance, the offerors also provided additional information to support their learning curves that projected greater efficiencies as the work progressed. *See supra,* at 673–75, 677–78. This approach is sanctioned by the FAR, which recognizes that a price-realism determination may require the contracting officer to obtain "information other than cost or pricing data," 48 CFR § 15.403–3 (heading, capitals omitted), "but the contracting officer should not obtain more information than is necessary." 48 C.F.R. § 15.403–3(a)(1).

Price-realism analysis is a well-established analytical tool in government contracting, primarily designed to weed out offers that reflect an unrealistically low price and thus put performance at risk. *See* Ralph C. Nash & John Cibinic, *Price Realism Analysis: A Tricky Issue,* 12 No. 7 Nash & Cibinic Rep. ¶ 40 (1998). As Professors Nash and Cibinic commented:

> An unrealistically low price can indicate that the offeror does not understand the work to be done. However, such a conclusion is not inevitable because the offeror might have intentionally offered a low price to win the competition (the so-called "buy-in"). In either case, acceptance of an unrealistically low price with a resulting lack of sufficient funds in the contract— may pose a risk of poor performance or even a lack of capability to perform (nonresponsibility).

*Id.* at 108.

The Air Force's price-realism analysis was conducted in a setting that emphasized a high level of technical performance in performing KC–135 PDM. *See* AR 6–5 (stating this is a "performance-based acquisition"). The offeror's ability to deliver satisfactory PDM work was addressed by evaluating proposal risk for each of the five subfactors comprising the mission capability factor and by past performance. AR 4–79 (Solicitation–Request for Proposal). The proposal risk assessment analysis examined "the risks and weaknesses associated with an [o]ffer-

---

**50.** This price differential was slightly over one percent of the projected $1.2 billion cost of the

contract over its term, including option years.

or's proposed approach and includes an assessment of the potential for disruption of schedule, increased cost, degradation of performance, and the need for increased [g]overnment oversight, as well as the likelihood of unsuccessful contract performance." AR 4–82 (Solicitation–Request for Proposal). The Air Force's past performance analysis was designed to evaluate "the probability of an [o]fferor successfully performing as proposed." AR 4–80 (Solicitation–Request for Proposal).

The key to the offerors' proofs in satisfying the Air Force's demand for a lower price and improved technical performance was their ability to implement a Lean program, eliminating unnecessary activities and streamlining procedures. *See supra,* at 672–73. The efficiency gains realized from the Lean program conceptually would allow a reduction in cost while decreasing errors and faults. *Id.; see also* AR 54–7 (Contracting Officer's Statement of Facts).

A learning curve is a graphical representation of the expected efficiency gains that stem from the learning process and the improvement that comes from workers and technology repeatedly performing the same task. AR 22–887 (Boeing Initial Proposal); Hr'g Tr. 219:1–5. To be valid or at least to provide a good estimate for a given project, a learning curve should be derived from data obtained with comparable work and with a regression analysis conducted on a statistically significant number of those data points. *See* Hr'g Tr. 220:7–19, 223:8–20. In the instant procurement, Boeing proposed that it would be able to achieve a[* * *] learning curve during the first year or so of the PDM work, a[* * *] percent efficiency gain, whereas Alabama Aircraft believed its past experiences translated to a[* * *] learning curve for the first year, a[* * *] efficiency

gain. AR 22–891 (Boeing Initial Proposal); AR 8–975 to 8–976 (Pemco Initial Proposal); *See* Hr'g Tr. 220:1–5.

Efficiencies projected by a learning curve become more difficult to achieve as time progresses because a company implements the most readily identifiable steps for realizing the projected improvement early in the life of the program. *See* Yelle, *The Learning Curve* at 311. Thus, learning curves tend to resemble an asymptotic function; as time progresses, the learning curve becomes flatter. Hr'g Tr. 220:5–6.[51] While efficiency gains from learning theoretically never cease, learning declines markedly as employees and technology repeatedly perform the same task. This stands in contrast to the beginning of the learning curve, which tends to have a steeper slope.[52]

In their initial proposals, Boeing and Alabama Aircraft failed to project any efficiency gains after [* * *] of the contract. AR 22–899 (Boeing Initial Proposal); AR 8–977 (Pemco Initial Proposal). When the Air Force specifically inquired why the offerors had failed to apply continuous learning and to project efficiency gains for the duration of the contract, AR 9–5 to 9–6 (Pemco Initial Evaluation Notices), AR 23–4 (Boeing Initial Evaluation Notices), [* * *] Boeing and Pemco declined to [* * *]. *See supra,* at 673–75. Boeing referred to concerns regarding "the recent volatility in the PDM throughput and the unknowns associated with the work package in [* * *] through [* * *]." AR 24–6 (Boeing's Initial Offeror Response Summary). Pemco advised that "[t]he [l]earning curve will have matured by the completion of the [* * *]." AR 10–9 (Pemco's Initial Offeror Response Summary).

Nonetheless, in its final proposal to the Air Force, Boeing offered a[* * *], AR 27–876 (Boeing Final Proposal Revision), projecting

---

**51.** An asymptote is "a straight line associated with a curve such that as a point moves along an infinite branch of the curve the distance from the point to the line approaches zero and the slope of the curve at the point approaches the slope of the line." *Merriam–Webster Collegiate Dictionary* 72 (10th ed.1999); *see also* William Karush, *Webster's New World Dictionary of Mathematics* 17 (1989).

**52.** The steepness of the curve's slope earlier in the Lean program is driven by the comparative ease in attaining efficiency gains before the program reaches its maturity. *See* Hr'g Tr. 219:2–4. Thus, the shape of a learning curve reflects the principle of diminishing returns. While continuous learning is possible, it requires a larger number of repetitive experiences to realize a smaller rate of improvement than was achieved at the start of the process. Hr'g Tr. 219:5–15.

efficiencies enabling it to "offer[ ] almost [* * *] fewer hours than Pemco did for the basic PDM requirements" and to reduce its final price by a sufficient margin to allow it to have the lowest total evaluated price. *Pemco Aeroplex II,* AR 63–5. Boeing's final proposal did not address why it implemented a[* * *] in light of the concerns the company expressed in response to the Air Force's inquiry. AR 27–876 (Boeing Final Proposal Revision). In its comments in response to the initial GAO hearing, Boeing asserted that its decision to rely on [* * *] learning to reduce "touch" hours in its final proposal was the product of a conscious business decision to assume the risk of achieving such results [* * *] years of contract performance. AR 87–43 to 87–44 (Boeing Post–Hearing Comments, B–310372.1).

As GAO found, the Air Force's initial evaluation of the offerors' proposal failed to properly address and document the viability of Boeing's reduction in labor hours and price. *Pemco Aeroplex I,* AR 64–16. The need for the Air Force to conduct a proper price-realism analysis in this procurement was heightened because the contract awardee would be providing PDM to an aging KC–135 fleet. *Id.* Thus, GAO's initial decision recommended that the Air Force "perform and document a realism assessment regarding *Boeing's assumption of [* * *] decreasing labor hour requirements in the context of an aging KC–135 aircraft fleet,* along with a risk assessment regarding the potential for schedule disruption, degraded performance, increased cost, and increased government oversight created by Boeing's labor hour reductions." *Id.,* AR 64–22 (emphasis added).

The Air Force's resulting price-realism analysis of Boeing's proposal was limited to information contained in Boeing's second final proposal revision submitted in June 2007. AR 55–70 (Protest B–310372.3, Attach. 3 (Mar. 7, 2008)). The Air Force neither conducted "any new studies or reviews" nor sought additional documentation or explanations from the offerors or third-party consultants in conducting its price-realism analysis. *Id.* On February 29, 2008, the Air Force Source Selection Authority concluded that the contract award to Boeing should be af-

firmed. AR 59–1 (Source Selection Decision Document).

GAO's initial decision identified the inconsistency of Boeing's reduced labor hour requirements given the "reality of the aging KC–135 fleet discussed by the agency." *Pemco Aeroplex I,* AR 64–17. The Air Force knew that Alabama Aircraft had been accounting for the problem of aging aircraft in its proposal. AR 93.1–1571 (Contracting Officer's Statement of Facts, B–310372.1). And, although Boeing had failed to indicate explicitly whether or not it was factoring in the potential increases in PDM work that would be associated with servicing an aging fleet of KC–135s, *See* AR 27–822 (Boeing's Final Proposal Revision) (stating the conditions, assumptions, and recommendations underlying Boeing's proposal), it had responded to the Air Force's inquiry about continuous learning by citing "the unknowns associated with the work package in [* * *] through [* * *]." AR 24–6 (Boeing's Initial Offeror Response Summary). In this respect, the Air Force knew that the aging KC–135s contributed to an "[u]pward trend in size and complexity of KC–135 PDM." AR 65–2 (Air Force Talking Paper). Furthermore, the history of performing maintenance on the KC–135 had shown "that growth in corrosion related work is a formidable challenge and carries significant flowday risk." *Id.* In short, the greatest unknown associated with the KC–135 PDM contract was the potential that the aging of the aircraft would require substantially more maintenance over time. *See id.*

Because the procurement at issue was for a fixed-price contract to perform PDM, AR 2–1 (Contracting Officer's Statement of Facts), the aging-aircraft issue was critical to the price-realism analysis. In *Pemco Aeroplex I,* GAO had recommended that the Air Force explicitly address the analytical relationship between aging aircraft and price realism. Then, in its decision denying the Air Force's request for reconsideration of its first protest decision, *Pemco Aeroplex II,* GAO adhered to its determination that the record of the procurement lacked a "contemporaneous evaluation of the effect of Boeing's reducing its proposed number of labor hours

on proposal risk or price realism," AR 63–5, while refusing to consider the Air Force's contention "that the RFP actually assumes a non-aging fleet." *Id.*, AR 63–5 to 63–6. GAO took this latter procedural step because the Air Force had not previously raised that defense. *Id.* Nonetheless, GAO commented that it found "unpersuasive the agency's claim that any portion of the cited documents put offerors on notice that they should assume an aircraft fleet that does not continue to age." *Id.*, AR 63–6 n. 4.

Subsequently, in conducting its price-realism analysis as the corrective action to GAO's grant of relief in the first protest, the Air Force adhered to the position it had taken before GAO in its motion for reconsideration. The Air Force's Proposal Analysis Report and Price Competition Memorandum stated that "[t]he acquisition strategy did not require Offerors to estimate the impact of aging aircraft issues in the out years since these impacts would be taken into consideration under new work packages negotiated for future fiscal years.... Addendum I [to the RFP] also clarified that the Air Force intends that negotiated adjustments to the proposed Firm Fixed Price ... would be made ... to accommodate ... chronic aging aircraft issues." AR 60–5 (Proposal Analysis Report and Price Competition Memorandum). Even more explicitly, the contracting officer's statement of facts filed with GAO in conjunction with Alabama Aircraft's second protest stated that

> [i]t was fully understood by the incumbent Offerors that out year work package changes would be negotiated since this has been the common practice for years on the prior PDM contracts. Any new Offeror should have understood this concept as well, due to the fact that RFP Addendum 1 stated that we would negotiate out year work package changes.

AR 54–9 (Contracting Officer's Statement of Facts).[53] Additionally, the revised Source Selection Decision Document relied on the fact that Addendum 1 to the RFP addressed the issue of aging aircraft by allowing the Air Force and the contract awardee to renegotiate its contract to account for increased O & A work. AR 59–2 (Source Selection Decision Document). In effect, rather than awarding a firm fixed-price contract as the RFP envisioned, the Air Force's subsequent statements indicate that this "fixed price" contract was subject to continued contractual renegotiations because of aging aircraft and was at best a firm fixed-price contract only for the first year.

The heavy reliance that the Air Force places on Addendum 1 to address the issue of performing PDM on an aging KC–135 fleet is not justified. First, the administrative record demonstrates that Boeing probably, and Alabama Aircraft emphatically, did *not* understand that the aging-aircraft issue was "off the table." Both offerors had initially applied learning curves to reduce "touch" hours for the PDM work only in the [* * *] of their offers because of concerns not just about the leveling of the learning curve but also about aging aircraft. *See supra*, at 673–75. Second, Addendum 1's statements regarding the potential for the Air Force to change the scope of the PDM work requirements for later years of the contract, AR 46.12–367 (RFP–Addendum 1), do not adequately support the Air Force's contention that the issue of additional maintenance required by aging aircraft was effectively taken off the table by provisions allowing for contractual renegotiation. That reference addresses only O & A work. Aging aircraft also will cause "standard" PDM to increase. That is so even if some categories of "standard" PDM work would be converted over time to O & A work because of the aging aircraft issue. *See* AR 78–139 (Pemco Comments on the Agency Record, Ex. V (C/KC–135 Depot Maintenance Hours per Aircraft (Feb.2006))) (illustrating graphically the increasing maintenance requirements for the KC–135). Indeed, the Air Force's own working paper projected that the aging of the

---

53. The contracting officer's statement of facts for the second protest before GAO somewhat inconsistently stated that the problem presented by aging aircraft was not "part of the analysis required by the evaluation criteria in the context of a solicitation for proposals," but aging aircraft were "an issue, from a contractual stand point." AR 54–21 (Contracting Officer's Statement of Facts).

KC–135 had the potential to increase "man-hours per aircraft from 26,000 to 44,000 by 2012." AR 65–2 (Air Force Talking Paper). The Addendum itself provides that "[a]ny tasks that require 200 or less hours to complete and are required to complete a task called out by the contract are considered to be part of the basic PDM effort under the contract even if they are not specifically called out by the contract or the attachments." AR 46.12–365 (RFP–Addendum 1). Thus, under the provisions of Addendum 1, many of the added maintenance tasks that result from servicing an aging KC–135 fleet would not be eligible for contractual renegotiation or incorporation into future O & A work packages.

In sum, the RFP and Addendum 1 did not notify offerors that the Air Force was seeking to receive proposals that were premised upon a non-aging KC–135 fleet. As a consequence, the Air Force's price-realism analysis that relies upon a non-aging fleet for its conclusions is fatally flawed. Furthermore, GAO's decision to reject the second protest offers no adequate rationale for sustaining the Air Force's action. In *Pemco Aeroplex IV,* GAO accepted that "the solicitation contemplate[d] periodic renegotiation of the required PDM work packages, along with negotiated adjustments to the contractor's compensation." AR 91–6 n. 10. As noted, Addendum 1 to the RFP indeed indicated that changes would occur for the O & A work, AR 46.12–367 (RFPAddendum 1), but that fact could not account adequately for the increasing demands for PDM work on an aging fleet, as discussed above. In addition, the record does not support GAO's further comment that even if the RFP and Addendum 1 did not remove the issue of providing PDM for the aging fleet, any increases in maintenance "would not be significant enough to offset Boeing's projected efficiencies." *Pemco Aeroplex IV,* AR 91–6. To the contrary, the record indicates that Boeing's rapidly flattening learning curve would be rapidly overtaken by the increasing demands for maintenance attributable to fleet aging. The Air Force's own estimates of these increasing demands show as much. *Compare* AR 60–15 (Proposal Analysis Report and Price Competition Memorandum)

(Boeing's learning curve), *with* AR 65–2 (Air Force Talking Paper) (providing the Air Force's estimate of the increasing hours required for PDM due to the aging of the fleet). In short, GAO was right the first time it addressed the issue, in *Pemco Aeroplex I* and *Pemco Aeroplex II,* and not the second time in *Pemco Aeroplex IV.*

Consequently, the court finds that the Air Force's price-realism analysis in this procurement was "arbitrary and capricious" within the meaning of 5 U.S.C. § 706(2)(A). The crucial challenge faced by the Air Force in this procurement was to provide maintenance appropriate to extending the useful life of an aging fleet of KC–135 Stratotankers. Failing in the first instance to deal explicitly with the aging-fleet issue in the RFP, as amended, and then seeking to sidestep the aging-fleet issue in the price-realism analysis of Boeing's prevailing offer in this very close competition, renders the Air Force's award to Boeing unsustainable.

This result should not detract from the fact that the administrative record shows that the Air Force's actual PDM work in recent years on the KC–135 fleet has been exemplary. The record reflects timely completion of maintenance with nearly error-free results, and at a reasonable cost. The improvements over recent years at the Air Force's organic PDM line at Tinker Air Force Base and at Boeing's and Alabama Aircraft's facilities have been notable. The Lean program at those facilities has been successful. Moreover, the Air Force contracting officer and staff in this procurement undertook careful, painstaking work on all issues but one. The actions respecting that remaining issue, however, are determinative of the result in this case.

*D. Prejudice to Alabama Aircraft*

■ Having found that the Air Force's price-realism analysis was fatally flawed, the court turns to the question whether the error materially prejudiced Alabama Aircraft. *See Bannum,* 404 F.3d at 1351; *Advanced Data Concepts,* 216 F.3d at 1057. Both Boeing and Alabama Aircraft were considered as having submitted awardable offers. *See* AR 61–91 (Finalized Decision Briefing) ("All

[p]roposals are [a]wardable."). The Air Force also concluded that "[t]he two incumbents, Boeing and PEMCO, are similarly priced with Boeing slightly lower by $15,048,602 at the bottom line T[otal] E[valuated] P[rice]." AR 59–25 (Source Selection Decision Document). The Air Force chose Boeing as the contract awardee because "of Boeing's superior Mission Capability proposal and $15,048,062 lower T[otal] E[valuated] P[rice]." AR 59–27 (Source Selection Decision Document). Boeing's decision to embrace a[* * *] learning curve in its final proposals accounted for its lower price. *Pemco Aeroplex I*, AR 64–15. Thus, the Air Force's failure to conduct an appropriate price-realism analysis on one of the two outcome determinative factors in this procurement affected which of the competitors would receive the contract.

In sum, Alabama Aircraft has demonstrated that "there was 'a substantial chance it would have received the contract award' " had the Air Force conducted an appropriate price-realism analysis that accounted for the increased maintenance needs of its aging KC–135 fleet. *Galen Med. Assocs.*, 369 F.3d at 1331 (citation omitted); *see also PGBA, LLC v. United States*, 60 Fed.Cl. 196, 220–21 (2004), *aff'd*, 389 F.3d 1219 (Fed.Cir.2004). Thus, Alabama Aircraft has shown that it has been prejudiced by the Air Force's failure to conduct an appropriate price-realism analysis.

### III. EQUITABLE RELIEF

■ If a protester succeeds in showing that the contracting agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), the court "may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2). The decision whether injunctive relief should issue is governed by the traditional four factor test: "(1)whether . . . the plaintiff [protestor] has succeeded on

the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA*, 389 F.3d at 1228–29 (citing *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)).[54] In awarding injunctive relief, a court endeavors to place the plaintiff in "the position they would have occupied in the absence of [the violation]." *Milliken v. Bradley*, 433 U.S. 267, 280, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); *see also Missouri v. Jenkins*, 515 U.S. 70, 88, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) ("[T]he nature of the . . . remedy is to be determined by the nature and scope of the . . . violation.") (citation omitted).

Alabama Aircraft requests that this court issue a permanent injunction setting aside the award to Boeing and directing the Air Force to award it the KC–135 PDM contract. Pl.'s Mot. at 39–40. Alternatively, Alabama Aircraft seeks to enjoin performance of the new contract until the Air Force reevaluates the proposal submitted under the RFP and issues a new award decision. *Id.* at 40.

In applying the four factor test for injunctive relief, Alabama Aircraft is in a relatively strong position because it has succeeded on the merits of its claims and demonstrated that it was prejudiced by the Air Force's errors. Therefore, Alabama Aircraft has satisfied the test's first factor.

In examining whether Alabama Aircraft will suffer irreparable harm if the court denies the requested injunctive relief, the court begins its analysis with the question of whether Alabama Aircraft has an adequate remedy at law. It is hornbook law that the "mere loss of money does not qualify as irreparable harm if the party can be made whole through money damages." *Hawaiian Dredging Constr. Co. v. United States*, 59 Fed.Cl. 305, 317 (2004). However, in bid-protest cases the governing statutory regime curtails the amount of monetary relief a

---

**54.** The Supreme Court's decision in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006), uses slightly different words to describe what is essentially the same test for equitable relief.

court may grant. *See* 28 U.S.C. § 1491(b)(2) (limiting money relief in bid protest cases "to bid preparation and proposal costs"). Therefore, in a bid protest, "a lost opportunity to compete on a level playing field for a contract ... has been found sufficient to prove irreparable harm." *Seattle Sec. Servs., Inc. v. United States,* 45 Fed.Cl. 560, 571 (2000); *see also Hospital Klean of Tex, Inc., v. United States,* 65 Fed.Cl. 618, 624 (2005) ("Here, absent injunctive relief, [plaintiff] will lose the opportunity to earn the profit it would have made under this contract.").[55] Given the Air Force's failure in the RFP and amendments to address the aging nature of the KC–135 fleet and the Air Force's associated failure to conduct an appropriate price-realism analysis, Alabama Aircraft has shown that it will suffer irreparable harm absent action to enjoin the award of the KC–135 PDM contract to Boeing.

In balancing the hardships among Alabama Aircraft, the government, and Boeing, the court must weigh the potential harm to Alabama Aircraft if injunctive relief is not awarded against the potential harm to the government and Boeing if such relief is granted. If the court failed to award the requested equitable relief, the hardship that would befall Alabama Aircraft is manifest-it would be deprived of the opportunity to compete for, and perhaps perform, a contract which was awarded to Boeing on the basis of a flawed RFP and an equally flawed price-realism analysis. Alabama Aircraft claims that the government will not suffer any hardship because it is "willing and able to provide uninterrupted KC–135 PDM," Pl.'s Reply at 49, just as Boeing also has shown itself willing and able to provide continuing PDM under the bridge contract with Alabama Aircraft serving as Boeing's subcontractor. Mitigating any harm to the Air Force is the presence of an option to extend the current bridge contract beyond September 30, 2008. Hr'g Tr. 92:20–24. This option period would allow the Air Force to ensure that the KC–135 Fleet continues to receive the necessary PDM.

The Air Force contends that the balance of the hardships favors it because its "expressed need for uninterrupted PDM on the KC–135" necessitates that the award to Boeing be allowed to move forward. Def.'s Cross–Mot. at 40. The Air Force claims that its ability to support the KC–135 aircraft will be downgraded if it is unable to move ahead with the award to Boeing. *Id.* at 39. Furthermore, the Air Force claims that reopening negotiations will force the government to "deal with Boeing upon a sole source basis" and will result in the government not recognizing the savings that came from a competitive solicitation. *Id.* at 39–40. These claims by the Air Force are patently without merit. Nothing prevents the Air Force from obtaining more favorable terms for a new bridge contract, either from Boeing or Alabama Aircraft, each of whom quoted closely comparable prices for continuing PDM, or from both of them.

Boeing's discussion of the hardship factor focuses upon the harm that has befallen the Air Force due to the delayed start of performance caused by the legal challenges to the Air Force's award decision. Boeing's Cross–Mot. at 49. Boeing avers that this delay has "prevented [the Air Force] from proceeding under a contract that offers significant cost advantages." *Id.* In addition, Boeing cites other aspects of its proposal that the Air Force has been unable to invoke because of the delay in beginning performance caused by Alabama Aircraft's challenge. *Id.*

Balancing the hardships between the claims of Alabama Aircraft, on the one hand, and the government and Boeing on the other, the court concludes that enjoining the Air Force's award of the contract to Boeing would not work a serious hardship on the Air Force and Boeing. Under the current bridge contract, both Boeing and Alabama Aircraft have shown an ability successfully to work together. Neither Alabama Aircraft nor Boeing have indicated that they would be unwilling to continue in their present contractual relationship if the Air Force's deci-

---

**55.** "Support also exists for the proposition that the denial of the right to have a bid fairly and lawfully considered constitutes irreparable harm." *Overstreet Elec. Co. v. United States,* 47 Fed.Cl. 728, 744 n. 25 (2000) (citations omitted).

sion were overturned and more time was needed to solicit and award a new contract. Importantly, as the bridge contract has progressed, Alabama Aircraft and Boeing have shown increased proficiency in performing KC–135 PDM. AR 19–37 (Pemco Past Performance Worksheets), AR 33–63 (Boeing Past Performance Worksheets). For fiscal year 2007, Boeing and Alabama Aircraft's accepted defects per KC–135 serviced were very low. AR 19–37 (Pemco Past Performance Worksheets), AR 33–63 (Boeing Past Performance Worksheets). Thus, enjoining the award to Boeing would not prevent the Air Force's aging fleet of KC–135 Stratotankers from receiving high-quality PDM. The potential that this PDM might be at a slightly higher price than the Air Force would like is dependent upon the Air Force's ability to negotiate a bridge contract or an extension of the current bridge contract with modified terms.

The final factor for the court to consider in examining Alabama Aircraft's request for injunctive relief is whether granting the requested relief would serve the public interest. It is well established that there is "an overriding public interest in preserving the integrity of the procurement process." *Hospital Klean*, 65 Fed.Cl. at 624. Mindful of the considerations that have informed its analysis, the court finds that the public interest would be served by issuing injunctive relief. Appropriately framed, an injunction will not adversely affect the Air Force's ability to maintain the KC–135 fleet. And, the public's strong interest in a fair procurement process and in providing a remedy for a flawed procurement process and result trumps the concerns set forth by the government in its briefs. *See id.* at 624. Thus, the court concludes, after an examination of the relevant factors, that Alabama Aircraft is entitled to an injunction setting aside and nullifying the Air Force's award of the KC–135 PDM contract to Boeing. Before it may award a new contract for KC–135 PDM, the Air Force must initiate a new solicitation and adequately address the issue of performing maintenance on an aging KC–135 fleet.

## CONCLUSION

For the reasons stated, Alabama Aircraft's motion for judgment upon the administrative record is GRANTED IN PART.[56] Boeing's and the government's cross-motions for judgment upon the administrative record and their motions to dismiss are DENIED.[57]

The Air Force's award of Solicitation Number FA81005–05R–0014 to Boeing is set aside and the Air Force is enjoined from proceeding with the award to Boeing. The Air Force must resolicit the procurement and take the necessary steps in a new solicitation to address explicitly the role of an ever-aging KC–135 fleet on the PDM to be performed.

In addition, Alabama Aircraft is awarded its reasonable costs incurred in bid preparation and proposal. *See CNA Corp. v. United States*, 83 Fed.Cl. 1, 10 (2008); *Geo–Seis Helicopters, Inc. v. United States*, 77 Fed.Cl. 633, 650 (2007). Bid preparation and proposal costs are awarded in addition to injunctive relief because of the lengthy process involved with the procurement and the government's failure ever to clarify the aging-aircraft issue in the RFP and amendments to it. Alabama Aircraft shall submit its accounting of such costs on or before October 28, 2008. The government shall respond to Alabama Aircraft's submission on or before November 21, 2008.

The clerk is directed to enter judgment for Alabama Aircraft in accord with this decision. Because there is no just reason for delay regarding the award of injunctive relief, the court directs the clerk to enter final judgment under RCFC 54(b) respecting that relief.

---

**56.** Alabama Aircraft's motion for judgment is denied in part because the court is without power to direct the Air Force to award the contract to Alabama Aircraft.

**57.** Alabama Aircraft's motion dated August 7, 2008 for leave to file a memorandum addressing a matter identified in the court's earlier opinion is GRANTED IN PART and DENIED IN PART. It is GRANTED insofar as the motion and Appendix C to the motion are concerned, but it is denied respecting Exhibits A, B and D. The government's motion filed August 14, 2008 to strike Alabama Aircraft's motion is DENIED.

On or before October 6, 2008, the parties are requested to submit proposed redactions of any confidential or proprietary information that may be set out in this decision as rendered under seal.

No costs.[58]

It is so ORDERED.

---

58. The court acknowledges with appreciation the excellent briefs and oral arguments of each counsel in this exceptionally complicated case. Particularly given the time constraints that applied to counsels' work, the resulting presentations were commendable.

